KAUMAGRAPH Co., Respondent, *v.* STAMPAGRAPH Co., INC., and Others, Appellants, Impleaded with ARTHUR TURNER and Others, Defendants.

First Department, May 27, 1921.

**Injunction — when defendants will not be perpetually restrained from manufacturing articles by same processes used by plaintiff — conditions to authorize such injunction — when secret process or formula will be protected — enforcement of covenants ancillary to contracts of employment — restricting employees' right to labor.**

An injunction is improperly issued restraining the defendants perpetually from manufacturing articles by the same processes as used by the plaintiff, since the plaintiff had no proprietary right in the processes and secrets in question, where it appears that some of the members of a corporation so engaged had been at different times employees of the plaintiff under agreements not to disclose any of the secrets of the manufacture of any of the products produced by plaintiff, and it further appeared that some of these members had prior to their employment by plaintiff been employed by an English concern whose processes and secrets the plaintiff had used in the manufacture of its products, and there was no evidence that plaintiff used any secret process or had the exclusive right to use any process or machinery which the defendants were using.

To support such an injunction there must be adduced conditions of the strongest and most convincing character, as it is in restraint of trade and competition and is an inhibition upon a man's right to pursue his occupation, except for and in the interest of the plaintiff.

When a person has a secret process by which he is manufacturing an article for commerce, those who occupy a confidential relation, whereby they become possessed of the formula and method of manufacture, may not communicate such secret to competitors in business or engage in the same business and use the knowledge thus acquired to the detriment of the employer.

An employer does not lose his rights by communicating the results of his work to persons, even if many, in confidential relations to himself, under a contract not to make it public, and strangers to the trust will be restrained from getting the knowledge by inducing a breach of trust and using knowledge obtained by such breach. So, where the employer has developed new processes, and all the knowledge the employees have of these secret processes was gained as an incident to their employment, the rights of the employer will be enforced by the courts. But where the plaintiff in a case wholly fails to prove facts tending to show that any such condition exists, or that said plaintiff was using any secret process or had any exclusive right to use the process or machinery which the defendants were using, no protection will be given.

Covenants ancillary to a contract of employment restricting the employees' right to labor along the same line either for themselves or for others upon the termination of their employment are not favored by the law, and will not be enforced, unless there are special circumstances that render the restriction a reasonable protection to the employer's business, to prevent the employee from using knowledge *that he has acquired in the course of his employment,* of the secrets of the trade, methods or processes of the employer; and if the covenant taking these circumstances into consideration is not more extensive as to time or space than will afford a reasonable protection to the employer's business, it will be enforced.

However, where the employee brings to the employment skill previously acquired, and does not obtain, in the course of his employment, knowledge of methods and processes which are exclusively within his employer's control and right to use, it cannot be said that such a restraint is reasonably necessary to the employer's protection.

Contracts by employees, unreasonably limiting their right to pursue their trade or occupation in the future, are held to violate public policy, because the employees' means for procuring a livelihood for themselves and families are thereby diminished.

The purpose of the covenant in the instant case is not for the protection of the plaintiff from the revelation or use of secrets of its business, but is to remove from possible competition one whose knowledge and skill, acquired before he came into plaintiff's employ, has been found valuable to it and to prevent that same knowledge and skill being utilized for the benefit of himself and others, after he has ceased to be employed by plaintiff, and, therefore, such a covenant is an unreasonable restraint of trade and competition and not enforcible in a court of equity.

An injunction should not issue on behalf of a former employer against employees who had terminated their employment, where it appears that they were using a formula to which the plaintiff had no proprietary right, and had purchased two machines from the person who made machines for plaintiff, but the machines were not patented and the manufacturers were not bound to sell only to plaintiff, as such evidence does not show use by defendants of any secret process of the plaintiff.

APPEAL by the defendants, Stampagraph Co., Inc., and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 28th day of July, 1920, on the decision of the court rendered after a trial at the New York Special Term.

*Alexander S. Andrews* of counsel [*Edward J. Martin* with him on the brief], for the appellants.

*Julius Henry Cohen* of counsel [*J. Ard Haughwout* with him on the brief; *Esselstyn & Haughwout,* attorneys], for the respondent.

PAGE, J.:

The plaintiff has been granted, except as to the defendant Waaler, a most comprehensive decree, perpetually enjoining and restraining the defendants, their agents, servants, employees, representatives or other persons in any manner connected with them or any of them, (1) from manufacturing, selling, advertising or offering for sale, directly or indirectly, any transfer trade-mark stamps, embroidery designs, indelible letters, figures, or other similar articles made by the process known as the Kaumagraph dry process, or by the same process under any different or other name and from employing said process or the secret formula or formulas, machinery, dies, engravings or information used in connection with or forming a part of said process; (2) from disclosing to any other person, real or in law (*sic*), the said process or any part thereof, or any of the formulas, machinery, dies, methods of engraving or trade secrets used by said plaintiff in connection with said process; (3) from manufacturing, except for and at the request of the plaintiff, any machine or die to be used in manufacturing or producing transfer trade-mark stamps, embroidery designs, indelible letters, figures, or other similar articles by said process; and the decree further directs the Stampagraph Co., Inc., to account to plaintiff for all sales or contracts of sale made by it for any of the above specified articles.

To support such an injunction there must be adduced considerations of the strongest and most convincing character, for it is a perpetual restraint on these parties from prosecuting a business, and on some of them from engaging at any time in a trade or occupation in which they have spent a large portion of their lives. It is in restraint of trade and competition, and is an inhibition upon a man's right to pursue his occupation, except for and in the interest of the plaintiff.

The reasons stated by the learned justice at Special Term for his decision are twofold: *First*, that two of the defendants had made contracts of employment with the plaintiff in which were negative covenants against engaging in a similar occupation; and *second*, that the plaintiff was engaged in manufacturing under a secret process and that the defendant Turner, after leaving plaintiff's employ, had joined with the

defendants George H. Chadwick, Mary Calrow, Harry A. Himer and Alexander W. Moffat in organizing and incorporating the Stampagraph Co., Inc., for the purpose of manufacturing and selling some of the same articles made by the same process as that used by the plaintiff.

When a person has a secret process by which he is manufacturing an article for commerce, those who occupy a confidential relation, whereby they become possessed of the formula and method of manufacture, may not communicate such secret to competitors in business or engage in the same business and use the knowledge thus acquired to the detriment of the employer.

" Courts of equity will restrain a party from making a disclosure of secrets communicated to him in the course of a confidential employment. And it matters not, in such cases whether the secret be secrets of trade, or secrets of title, or any other secrets of the party important to his interests." (2 Story Eq. Juris. [14th ed.] § 1283.)

" The plaintiff has the right to keep the work which it has done, or paid for doing, to itself. The fact that others might do similar work, if they might, does not authorize them to steal the plaintiff's.   *   *   *   The plaintiff does not lose its rights by communicating the result to persons, even if many, in confidential relations to itself, under a contract not to make it public, and strangers to the trust will be restrained from getting at the knowledge by inducing a breach of trust and using knowledge obtained by such a breach." (*Board of Trade* v. *Christie Grain & Stock Co.*, 198 U. S. 236, 250.)

These principles are well settled and have been recently declared and enforced by our courts. (*Vulcan Detinning Co.* v. *Assmann*, 185 App. Div. 399; *Eastman Kodak Co.* v. *Powers Film Products, Inc.*, 189 id. 556.) In these cases the plaintiff had developed a new process for producing the results obtained; all the knowledge that the employees had of this secret process they had obtained in the course of their employment by the plaintiff and as a necessary incident of their employment. In order to bring itself within the protection of these equitable principles it was necessary for the plaintiff to prove that it was employing in its business a secret process either developed by itself, or the sole right to use which had been acquired by

it from the discoverer of the process. The plaintiff in the instant case wholly failed to prove facts tending to show any such condition to exist.

The plaintiff is engaged in the business of manufacturing and selling designs printed upon tissue paper with a composition that will transfer the design to a fabric when the paper is laid face down upon the fabric and a heated iron applied to the back of the paper. These designs are used for transferring trade marks and lines for embroidery or pattern cutting. The manufacture and sale of such transfer designs had been known and carried on in England, and in more limited extent in this country, for many years before the plaintiff was organized. One of the principal concerns in the business was William Briggs & Co., Ltd., of Manchester, Eng., who had a representative in this country selling their product or manufacturing similar designs by their process. The process they employed was that patented by John Briggs in 1874 in England and in the United States by his executors in 1879, and an improvement in such process patented in England by Joseph Scott. The Briggs patent covered a transfer of pattern to fabric " by printing the pattern paper from a surface block or otherwise, as usual with the design to be produced in a bituminous substance or varnish, and transferring the said pattern to the fabric when required by the application of heat to the back of the paper," and stated: " We make no claim to any process or apparatus for printing the patterns in bituminous substance or varnish on the pattern paper as they may be printed by blocks, or cylinders, or otherwise." The Scott patent covered an improvement on the Briggs patent by adding a metallic powder to the existing process, thereby preventing running or spreading on the application of heat. This patent set out the formula which is substantially the same as that used by the Stampagraph Co., Inc. Shortly prior to 1902, one J. C. Jack visited England and learned of the process used by William Briggs & Co., Ltd., and met and discussed the matter with the defendant George Chadwick and William Scott who were then in the employ of William Briggs & Co., Ltd. Chadwick had been so employed for thirteen or fourteen years and Scott for three or four years. Jack suggested that Scott and Chadwick leave

Briggs' employ and come to the United States for the purpose of establishing the business here. On Jack's return an association of five persons, of which Jack and Munroe, the plaintiff's president, were members, was formed to engage in the business of making transfer stamps, under the name of the Kaumagraph Co. Jack then entered into negotiations with Scott, as a result of which a contract was made, dated September 3, 1903, which recited that Scott and Jack owned and had possession of certain machinery, patents, formulas, apparatus, processes, etc., for the production of trade-mark stamps, indelible letters, embroidery transfer designs, etc., known generally as the transfer design process, and desired to become associated with the other four members of the association. The contract provided for the formation of a corporation to be known as the Kaumagraph Co. in which Scott and Jack were to have a forty-five per cent interest and the others fifty-five per cent. The four persons agreed to furnish the capital to conduct the business for an initial period of six months with a stipulation limiting their united liability to $1,200. The sum of $350 was to be advanced to enable William Scott to come to New York bringing with him necessary machinery and designs to establish the business. Scott was to be paid $7.50 per week for a period of six months, dating from the time of the erecting of the machinery in working order. Scott and Jack on their part agreed to hold the formulas, patents, machinery, designs, etc., exclusively for the use and furtherance of the business therein contemplated, and under no circumstances were any designs, machinery, formulas, patents or merchandise or information relating to the business to be transferred or communicated to any other party or parties.

The $350 was sent to William Scott and he came to this country, bringing with him some machinery and the knowledge of the process used in the business conducted by William Briggs & Co., Ltd. Neither Scott nor Jack was owner or licensee of any patents or secret formulas. Monro, the plaintiff's president, testified that he had obtained a copy of the Scott patent and that it was the underlying basis for all of the plaintiff's work, experiments and improvements. About four months after Scott came to this country, George

Chadwick came over and immediately entered into the employ of the association. About two months thereafter a written contract of employment was entered into between the association known as the Kaumagraph Co. and Chadwick, which recited that Chadwick desired to be employed in the capacity of " an expert workman in the production of dies, trade-mark stamps, embroidery designs, indelible letters, etc., by a process advertised and now popularly known as the Kaumagraph Process." Chadwick was hired for a period of ten years at a salary of fifteen dollars per week for the first six months and twenty dollars per week thereafter if the increase of the business should warrant it; and the contract contained other provisions which will be considered hereafter. In 1905 the plaintiff was incorporated as successor to, and under the name of, the association. Chadwick continued in the employ of the plaintiff until after this action was tried. The defendant Arthur Turner, who was George Chadwick's brother-in-law, had also been employed by William Briggs & Co., Ltd., in Manchester, Eng. He came to New York in 1907 and was employed by the plaintiff, and after he had worked for about three months he signed a contract of employment for a term of ten years at a salary of fourteen dollars per week, which also contained the negative covenant which will be later considered. His employment ended with the termination of this contract.

Thus it would appear that all the plaintiff did was to appropriate a process of manufacture of transfer stamps that had been in use for many years before plaintiff obtained the knowledge of the process. Calling the process by a different name gave them no exclusive rights in the thing itself. It was thus proved that the plaintiff, when it commenced to manufacture, used the process and machinery theretofore used by William Briggs & Co., Ltd.

Counsel claims that the plaintiff has made improvements. If so, what were they? The defendant had the same right to use the process and machinery which had been used by William Briggs & Co., Ltd., as did the plaintiff. If there were changes and improvements in the formulas or in the machinery which did not result merely from skill in manipulation acquired by experience or from the application of well-

known mechanical devices, but which were such as to constitute invention, the plaintiff should have proved what they were, so that an injunction could be issued that would warn the defendants explicitly of the things prohibited and protect the plaintiff in the use of the improvements in which it was entitled to be protected. In no other way could the court determine the issue of fact, or frame an injunction that would intelligently apprise the defendants of the limitation put upon the legitimate use of the process and machinery by them. Nor could the court, if it should be claimed that the injunction had been violated, in such proceeding decide the issue of fact, and determine whether the injunction had been violated. As was suggested by the Court of Errors and Appeals of New Jersey: "For the protection of the complainant, the usual course is to take the evidence as to the secret in camera, as was done in *Stone* v. *Grasselli Chemical Co.*† * * * It is not necessary to embody the description of the secret in the injunction itself. The testimony taken in camera may be sealed and used only when it becomes necessary to determine whether there has been a violation. It is true that the procedure involves a risk to the complainant of his secret becoming public; but that difficulty is inherent in the subject. It is a difficulty to which the complainant must submit if he seeks to retain the benefit of his secret for an indefinite time, and is not content with the more effective protection for a shorter period which is offered by our copyright and patent laws." (*Taylor Iron & Steel Co.* v. *Nichols,* 73 N. J. Eq. 684, 690.) The plaintiff in the instant case failed to prove that it used any secret process or had any exclusive right to use the process or machinery which the defendants were using.

There remains the question of the plaintiff's right to enjoin the defendants George Chadwick and Arthur Turner by virtue of the negative covenants in their contracts.

The first agreement with George Chadwick contained a covenant that under no circumstances nor at any time would Chadwick "engage in any business similar to, or conflicting with, the business of the Kaumagraph Company, or produce dies, trade-mark stamps, embroidery designs or

† 65 N. J. Eq. (20 Dick.) 756.— [REP.

indelible letters by said Kaumagraph process or any similar process, except as herein provided, without the written consent of the " plaintiff. On February 1, 1909, six years before this contract expired, the plaintiff insisted on a new contract for a term of ten years from that date. To this Chadwick objected, and a new contract was prepared for the unexpired term of the first, which Chadwick signed. This provided for payment of a salary of thirty-five dollars per week for the first year and forty dollars per week thereafter, and further provided: " In consideration of the foregoing the party of the second part agrees that he will remain in the employ of the party of the first part for a period of six years from the date hereof and in consideration of the agreements hereinbefore set forth, party of the second part agrees that he will not at any time engage in any business similar to or conflicting with the business of the said Kaumagraph Company or produce dies, trade-mark stamps, embroidery designs or indelible letters by any one or more of the processes employed by the said Kaumagraph Company or by any similar processes or manufacture, or produce such articles or engage in such processes in any way by sale or otherwise connected with the trade within the territory of the United States east of the Mississippi River or in the Dominion of Canada, without first securing the written consent of the party of the first part." The contract further provided that it should " continue in full force as to all its stipulations for an indefinite period after the date of its expiration, until terminated by notice in writing from either party one year in advance."

In the latter part of the year 1918 George Chadwick was reduced from the position of superintendent, and a man with no previous experience in the business was put over him; and on January 13, 1919, he gave the plaintiff one year's notice in writing of the termination of the contract. He did no act in violation of his agreement, nor so far as the proof shows was he disloyal to his employer. The sole justification for enjoining him was his statement that when he left the plaintiff's employ he should go into a similar business. It must be borne in mind that Chadwick for thirteen or fourteen years before he entered into the plaintiff's employ had worked for the William Briggs & Co., Ltd. It was because of his knowl-

edge of and skill in the business that plaintiff employed him. He worked for the plaintiff for about sixteen years. Thus thirty years of his life had been spent in this one employment. While he worked for plaintiff his salary ranged from fifteen dollars to forty dollars per week. The judgment goes beyond even the terms of the negative covenant; it is unlimited as to time or space. George Chadwick by the decree is perpetually enjoined from ever again in any place working at the only trade he knows. Under this decree he could not return to England and engage again with William Briggs & Co., Ltd. He must work hereafter for the plaintiff or not work at all at the only trade he knows. The books will be searched in vain for a precedent for so unjust and oppressive a decree. As has been well said: "Such a restraint savors of servitude, unrelieved by an obligation of support on the part of the master." (*Taylor Iron & Steel Co.* v. *Nichols, supra.*) · Had the decree followed the terms of the covenant and contained a limitation as to space, it could not be sustained. The person who drafted this covenant evidently had in mind the case of *Diamond Match Co.* v. *Roeber* (106 N. Y. 473) and similar cases where covenants not to engage in the same business for a limited time and within a limited territory have been enforced. But in those cases the covenant was ancillary to the sale of a business and it was held that such a restraint within reasonable limits was not an unreasonable restraint upon trade, such a restriction being necessary to the protection of the good will of the business sold and the purchase price furnishing an adequate consideration therefor. Covenants ancillary to a contract of employment restricting the employees' right to labor along the same line either for themselves or others upon the termination of their employment are not favored by the law, and will not be enforced, unless there are special circumstances that render the restriction a reasonable protection to the employer's business, to prevent the employee from using knowledge *that he has acquired in the course of his employment,* of the secrets of the trade, methods or processes of the employer. If the covenant taking these circumstances into consideration is not more extensive as to time or space than will afford a reasonable protection to the employer's business, it will be enforced. (*McCall Co.* v.

*Wright,* 198 N. Y. 143; *Eastman Kodak Co.* v. *Powers Film Products, Inc., supra.*) Where, however, the employee brings to the employment skill previously acquired, and does not obtain, in the course of his employment, knowledge of methods and processes which are exclusively within his employer's control and right to use, it cannot be said that such a restraint is reasonably necessary to the employer's protection. (*Mandeville* v. *Harman,* 42 N. J. Eq. 185; *Mallinckrodt Chemical Works* v. *Nemnich,* 83 Mo. App. 6; affd., 169 Mo. 388; *Herreshoff* v. *Boutineau,* 17 R. I. 3; *Bingham* v. *Maigne,* 20 J. & S. [52 N. Y. Super.] 90; *Witkop & Holmes Co.* v. *Boyce,* 61 Misc. Rep. 126.)

In contradistinction to the sale of a business an employee ordinarily receives no consideration other than the fact of present employment; his labor is a full return for his wage. Contracts by employees, unreasonably limiting their right to pursue their trade or occupation in the future, are held to violate public policy, because the employees' means for procuring a livelihood for themselves and family are thereby diminished. They are deprived of the power of usefulness, and the public is deprived of the benefit of the exercise by them of their knowledge and skill. The purpose of the covenant before us is not to protect the plaintiff from the revelation or use of the secrets of its business, for it is not so limited; but it is to remove from possible competition one whose knowledge and skill, acquired before he came into its employ, has been found valuable to it and to prevent that same knowledge and skill being utilized for the benefit of himself and others, after he has ceased to be employed by plaintiff. Such a covenant is an unreasonable restraint of trade and competition and will not be enforced in a court of equity.

Arthur Turner was employed at a salary of fourteen dollars per week and his contract contained a covenant in language almost identical with that in George Chadwick's second agreement. When this contract was about to expire, a new contract was prepared. The person who drew the contract seemed fearful that the words " at any time " might be construed to mean at any time during the term of the contract, and, therefore, the new contract provided " at any time before or after

the termination of this contract." This contract Turner refused to sign and he was thereupon discharged. Nevertheless he is now bound by this decree never at any time or place to enter into a similar or competing business. Mary Calrow, working for the defendant as typewriter and office clerk, knowing nothing of the alleged secrets or process of manufacture, not claimed to have copied or used any trade lists or brought any information that she could not properly bring to the new enterprise, is perpetually enjoined without limitation of time or place from engaging in a similar or competing business, although she never signed any agreement, but worked from week to week with no term. George H. Chadwick, who worked for the plaintiff a few weeks during his school vacation as a boy having no special knowledge of the business, is likewise forever enjoined; and Moffat and Himer, who never had any previous connection with the plaintiff, are also perpetually enjoined.

The Stampagraph Co., Inc., was organized by Arthur Turner, George H. Chadwick, Mary Calrow, Henry A. Himer and Alexander W. Moffat in March, 1919, with a capital of $2,000; and is manufacturing some of the articles that the plaintiff manufactures under the process set forth in the Scott patent. They purchased two machines from the person who made machines for the plaintiff. As the machine was not patented and the manufacturer was not then bound by agreement not to manufacture them for others, he had a right to sell and they to buy. The evidence does not show that the defendants are using any secret process of the plaintiff.

The judgment and findings inconsistent with this opinion should be reversed, with costs, and judgment directed for the defendants, with costs.

CLARKE, P. J., LAUGHLIN, SMITH and MERRELL, JJ., concur.

Judgment reversed, with costs, and judgment directed for the defendants, with costs. Settle order on notice.