**AMERICAN INSTITUTE OF CHEMICAL ENGINEERS, Plaintiff-Appellant,**

v.

**REBER–FRIEL COMPANY, Defendant-Appellee.**

No. 928, Docket 81–7695.

United States Court of Appeals, Second Circuit.

Argued March 31, 1982.

Decided June 28, 1982.

---

William F. Sondericker, New York City (Jeffrey H. Sheetz, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, of counsel), for plaintiff-appellant.

Leon P. Gold, New York City (Mark E. Davidson, Ronald D. Lefton, Shea & Gould, New York City, of counsel), for defendant-appellee.

Before FEINBERG, Chief Judge, MANSFIELD, Circuit Judge, and MISHLER, District Judge.*

MISHLER, District Judge.

Plaintiff American Institute of Chemical Engineers ("AIChE"), a New York corporation, is the sponsor of two chemical industry

* Honorable Jacob Mishler, United States District Judge, Eastern District of New York, sitting by designation.

trade expositions. Defendant Reber-Friel Company ("Reber-Friel"), a Pennsylvania exposition management corporation, managed AIChE's trade shows from 1961 until April 1981 pursuant to a series of written agreements between the parties. As of April 1981 Reber-Friel was terminated as managing agent. On August 21, 1981 AIChE commenced this action seeking, *inter alia*, to enjoin Reber-Friel from conducting its own chemical processing exposition, the conduct of which is claimed to be in breach of a covenant not to compete contained in their agreement. A hearing on a motion by AIChE for a preliminary injunction was held before Judge Pierce on September 22 through 24. Five days prior to the hearing Reber-Friel cross-moved for summary judgment and for an order dismissing the complaint for lack of subject matter jurisdiction.

After plaintiff's presentation at the hearing, Judge Pierce, in an oral opinion, denied the motion for an injunction [1] and dismissed as moot AIChE's claim for return of documents accumulated by Reber-Friel in connection with the management of its shows. The court also denied Reber-Friel's motion to dismiss for lack of subject matter jurisdiction but reserved decision on the motion for summary judgment. On November 24, 1981, Judge Pierce issued a Memorandum Opinion and Order granting Reber-Friel's summary judgment motion and judgment was entered thereon. This appeal followed. [2]

### FACTS

The undisputed facts are as follows:

AIChE is a not-for-profit educational and scientific corporation organized under New York law for the purpose of the advancement of chemical engineering. AIChE grants funds to universities for research and advancement in the field of chemical engineering, sponsors committees to do research and write technical articles and papers, sponsors conferences and seminars, issues various publications and conducts educational programs. In furtherance of its efforts to raise funds to support such programs AIChE sponsors two major chemical expositions commonly known as the Petrochemical and Refining Exposition ("Petro Expo") and the Chemical Plant and Equipment Exposition ("CPE"). Petro Expo has been held every other year since 1961 and has an established reputation, the most recent show in April 1981 drawing about 700 exhibitors and producing a gross profit of over one million dollars. CPE is a relatively new show; the first show took place in 1978 and a second in 1980.

Reber-Friel has been actively engaged in the management and servicing of industry trade shows since 1939. Over the course of its history in business Reber-Friel consistently has managed and serviced trade shows for at least ten industry associations. From 1961 until 1981 Reber-Friel was the managing agent for AIChE's trade shows. It served as AIChE's managing agent pursuant to successive agreements containing substantially similar conditions. The agreement which is the subject of this litigation was for a term of three years, beginning September 1978, terminable prior thereto by either party upon proper notice. Under the agreements Reber-Friel had total responsibility over the planning and conduct of the shows "subject to the direction and control" of AIChE. Reber's duties included developing for AIChE a mailing list of prospective exhibitors, renting exhibit space,

---

1. At the conclusion of plaintiff's presentation of evidence at the hearing the court ordered that the trial on the merits be consolidated with the hearing on the preliminary injunction pursuant to Fed.R.Civ.P. 65(a)(2) and issued its findings of fact pursuant to Rule 41(b). Thereafter, AIChE timely demanded a jury trial and made objection to the consolidation. The court vacated its oral order to the extent it purported to consolidate the trial on the merits with the hearing on the preliminary injunction.

2. AIChE initially filed its appeal from the order of Judge Pierce denying AIChE's motion for a preliminary injunction. After Judge Pierce issued his decision granting summary judgment AIChE withdrew the prior appeal by stipulation without prejudice to obtaining review of the order denying the injunction on this appeal.

developing and distributing promotional material, developing a floor plan and rules and regulations, handling registration, servicing exhibitors, et cetera.[3] All correspondence pertaining to the expositions was required to be on AIChE stationery and all contracts for leasing exhibit space were required to be made in the name of AIChE or Reber-Friel as agent for AIChE. Reber-Friel was responsible for all expenses incurred in performing its duties under the contract. AIChE was responsible for leasing suitable exposition space after consulting with Reber-Friel as to its physical space requirements.

The agreements in effect before 1978 provided that as full compensation for its management services Reber-Friel would receive 40% of the "rental fees actually paid by commercial exhibitors at each exposition." In 1978 Reber-Friel, at the request of the new management of AIChE, agreed to accept 25% of the rental fees as full compensation for its services and the 1978 contract so provided. Over the past six years, management of AIChE's trade shows has accounted for 30% of Reber-Friel's gross profit. Of that approximately one-third was derived from commissions on rental income from exhibitors and two-thirds from service contracts with exhibitors.[4]

By letter dated October 30, 1980 to Mr. H. Grebe, president of Reber-Friel, AIChE's executive director notified Reber-Friel that after the next Petro Expo, scheduled to run through April 9, 1981, AIChE would terminate its agreement with Reber-Friel, stating that the termination was not related to Reber-Friel's performance but because the shows had achieved a level of maturity which made in-house management more profitable. The AIChE director suggested a future meeting with Grebe to set a schedule for the new manager to work with Grebe on the upcoming show in order to meet many of the exhibitors and "learn your procedures from sales to service, etc.," and hoped during the interim period to arrange for the "orderly transition and transfer of customer lists, promotional lists and other necessary records." Thereafter, Grebe tried without success to negotiate a continued relationship with AIChE by suggesting first in November and December 1980 that Reber-Friel serve as the general contractor for exhibitor services and finally by letter dated January 21, 1981, by offer-

---

3. Reber-Friel's responsibilities are spelled out in paragraph 2 of the agreement as follows:
   (a) To rent exhibit space to proper exhibitors and to plan and manage facilities at exposition hall for conferences and exhibits.
   (b) To develop for the Institute a mailing list of prospective exhibitors.
   (c) To assist the Institute in formulating policy and preparing floor plans and rules and regulations for the expositions.
   (d) To develop material for the sale or leasing of exhibit space and to assign such space.
   (e) To lease exhibit space for the Institute, to invoice exhibit space fees for the Institute on the Institute's Expositions stationery and to collect such fees for the Institute.
   (f) To act as general contractor in providing services for exhibitors.
   (g) To assist in the Institute's programs for the development of an audience.
   (h) To assist, under the direction of the Institute, at the exposition hall with the physical facilities for registration activities. However, all registration facilities shall be paid for by the Institute except those expenses necessary for registering exhibitors which shall be borne by Reber-Friel.
   (i) To supervise physical arrangements for meeting at the exposition hall and manage

the installation, operation and removal of exhibits. All Meeting facilities shall be paid for by the Institute.
   (j) To supervise the entire exposition for the term of the lease of the exposition hall.
   (k) To be responsible for and pay all costs and expense incurred by Reber-Friel in connection with the following—the rental of booth equipment, exhibitors' service bulletins, the preparation of addressing plates and addressing of material to potential exhibitors and publicity outlets, the printing and disposition of promotional material, the rental of exhibit space to exhibitors, all travel, telephone and correspondence in connection with the rental of exhibit space to exhibitors, publicity, booth expenses, sales expenses, staff travel, stationery and contingencies.

4. Services provided by Reber to exhibitors include such items as freight handling, carpentry service, rental of equipment and decorating services. Some of the work was delegated by Reber-Friel to subcontractors. Under its agreement with AIChE, Reber-Friel was required to act as general contractor in providing services for exhibitors (see footnote 3 *supra*.)

ing its management services for only 20% of the rental income with a maximum of $115,000 per exposition.

In June 1981 Reber-Friel notified potential exhibitors of its sponsorship of a new chemical processing trade show, the Chem Pro Show, to be held on September 28–30, 1982 in the Convention Center in Pittsburgh, Pennsylvania (A.135), and a mailing of the Chem Pro Show brochure followed in July 1981. In May, Grebe had visited Pittsburgh and rented exhibition space and secured hotel rooms. Grebe had previously surveyed and recommended the Pittsburgh area as a possible location for AIChE's CPE shows which had been rejected.

AIChE seeks to enjoin Reber-Friel from conducting the September 1982 Chem Pro Show through enforcement of a covenant not to compete contained in the 1978 agreement which provides in pertinent part as follows:

> 4. *Ownership.* The Institute shall (insofar as Reber-Friel or any person, firm or corporation claiming through it or one of its officers is concerned) be, and remain during the term of this Agreement and thereafter, the sole owner of any and all AIChE Expositions and the terminology "Petrochemical and Refining Expositions" and "Chemical Plant and Equipment Expositions", *and for a period of three years after the end of the term of this Agreement Reber-Friel agrees that (unless the Institute otherwise agrees in writing) neither it nor any of its officers will manage or have any connection with*

*any exposition or show the principal subject matter of which is chemical plant equipment, petrochemicals and/or the refining of petroleum products.* (Emphasis added).

AIChE asserts that during the term of the restrictive covenant Reber's Chem Pro Show in Pittsburgh in 1982 will compete for exhibitors with AIChE's CPE show scheduled for June 1982 in Anaheim, California and its Petro Expo in April 1983 in Houston, Texas. To justify enforcement of the covenant, AIChE claims that in securing exhibitors for its show Reber-Friel has and continues to use information about exhibitors gathered and relationships with exhibitors established during its twenty years as AIChE's agent to unfairly compete with AIChE. AIChE also asserts separate claims for breach of fiduciary duty, conversion and unfair competition based on Reber-Friel's failure promptly to supply to AIChE all information and documents relating to its expositions and Reber-Friel's use of that information to promote its competing Chem Pro Show.

## I. *The Restrictive Covenant*

New York courts[5] adhere to a strict approach to enforcement of restrictive covenants because their enforcement conflicts with "the general public policy favoring robust and uninhibited competition," and "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood."[6] *American*

---

5. In this diversity action New York law governs in accordance with the agreement of the parties.

6. Restrictive covenants historically have been frowned upon as is evidenced by the discussion in *Mitchel v. Reynolds*, 1 P.Wms. 181, 24 Eng. Rep. 347 (Q.B.1711) where "[t]he court pointed out that the presumption of invalidity stems from the 'mischief' which the restraints may cause, first, in the possible loss of the covenantor's means of earning a livelihood and, second, in the loss to society of the services of a useful member." Blake, *Employee Agreements Not to Compete*, 73 Harv.L.Rev. 625, 629 (1960). The court noted its particular concern with such covenants in employment agreements because of the possibility of "great abuses ...

from masters, who are apt to give their apprentices much vexation on this account, and to use many indirect practices to procure such bonds from them, lest they should prejudice them in their custom, when they come up to set up for themselves." 1 P.Wms. at 190, 24 Eng.Rep. at 350.

The court, however, recognized the need for such covenants not to compete in the transfer of a business in order to make the business saleable. New York courts also recognize the validity of such covenants. In *Purchasing Assocs., Inc. v. Weitz, supra,* 13 N.Y.2d at 271, 246 N.Y.S.2d at 603, 196 N.E.2d at 247, it was stated:

Where, for instance, there is a sale of a business, involving as it does the transfer of its good will as a going concern, the courts will

*Broadcasting Companies, Inc. v. Wolf*, 52 N.Y.2d 394, 404, 438 N.Y.S.2d 482, 487, 420 N.E.2d 363, 368 (1981) (quoting *Purchasing Assocs., Inc. v. Weitz*, 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 604, 196 N.E.2d 245, 247 (1963)). Thus, a restrictive covenant will be "rigorously examined", *American Broadcasting Companies, supra*, 52 N.Y.2d at 403, 438 N.Y.S.2d at 486, 420 N.E.2d 363, 367, and enforced "only to the extent necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists," *Columbia Ribbon & Carbon Mfg. v. A–1–A Corp.*, 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 1006, 369 N.E.2d 4, 6 (1977), or "confidential customer information", *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 308, 386 N.Y.S.2d 677, 680, 353 N.E.2d 590, 593 (1976), to protect the "good will of the employer's business, or perhaps when the employer is exposed to special harm because of the unique nature of the employee's services." *American Broadcasting Companies, supra*, 52 N.Y.2d at 403, 438 N.Y.S.2d at 486, 420 N.E.2d at 367. Only after determining that a restrictive covenant would serve to protect against such "unfair and illegal" conduct and not merely to insulate the employer from competition, does the reasonableness of the covenant in terms of its "time, space or scope," or the oppressiveness of its operation become an issue. *American Broadcasting, supra*, 52 N.Y.2d at 403–04, 438 N.Y.S.2d at 486–87, 420 N.E.2d at 367–68. In the case before us we need not reach the question of the reasonableness of the scope of the covenant because legitimate interests of the employer are not implicated.

■ A customer list is not confidential where the past or prospective customers are "readily ascertainable" from sources outside the employer's business. *Columbia Ribbon & Carbon, supra*, 42 N.Y.2d at 499, 398 N.Y.S.2d at 1006, 369 N.E.2d at 6 (citing *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 392,

328 N.Y.S.2d 423, 427, 278 N.E.2d 636, 639 (1972)). However, a court will prevent the solicitation by a former employee of customers "who are not openly engaged in business in advertised locations" or whose "availability as patrons cannot readily be ascertained but 'whose trade and patronage have been secured by years of business effort and advertising, and the expenditure of time and money, constituting a part of the good will of a business which enterprise and foresight have built up.' " *Town & Country House & Home Serv., Inc. v. Newberry*, 3 N.Y.2d 554, 558, 170 N.Y.S.2d 328, 331, 147 N.E.2d 724, 726 (1958) (quoting *Witkop & Holmes Co. v. Boyce*, 61 Misc. 126, 131, 112 N.Y.S. 874, 878 (1908), *aff'd*, 131 App.Div. 922, 115 N.Y.S. 1150 (1909)). *Town & Country* and *Leo Silfen, Inc. v. Cream, supra*, 29 N.Y.2d 387, 328 N.Y.S.2d 423, 278 N.E.2d 636, illustrate the qualities of a protectable customer list. In *Town & Country*, plaintiff corporation was engaged in providing a somewhat unique home cleaning service and after three years of operation and thousands of telephone calls and visits to homeowners to discuss price and services had compiled a list of about two hundred and forty customers. The court found the requisite expenditure of time and money to prevent defendant, a former employee, from soliciting those customers. In contrast, in *Leo Silfen, Inc. v. Cream*, plaintiffs were engaged in the business of supplying building maintenance materials. To procure customers plaintiffs employed mailing houses which provided lists of prospects to whom brochures and business reply cards were forwarded. The court refused to enjoin defendant from soliciting plaintiffs' customers. "Although plaintiffs have demonstrated an investment of time and money in developing a patronage of approximately 15,000 enterprises, the investment was not an attempt to create a market for a new type of service as was the case in the *Town & Country* case. Rather, that investment

enforce an incidental covenant by the seller not to compete with the buyer after the sale.... This rule is grounded, most reasonably, on the premise that a buyer of a business should be permitted to restrict his sell-

er's freedom of trade so as to prevent the latter from recapturing and utilizing, by his competition, the good will of the very business which he transferred for value.

reflected simply widespread canvassing of an obvious and highly competitive market." 29 N.Y.2d at 394, 328 N.Y.S.2d at 429, 278 N.E.2d at 640.

The list of exhibitors in this case was gathered from publicly available sources, and for the most part consists of well-known national corporations in the petroleum industry. In addition, the names of the exhibitors, the addresses and their primary products is information which has been made available to the public through the distribution of exposition directories at each AIChE show. Other relevant information about each exhibitor has also been made publicly available. For instance, the floor plan of each AIChE show indicating the relative sizes of exhibits and their location in the exposition hall is distributed to the public at each show. Plaintiff has made no allegation and submitted no proof that Reber-Friel by virtue of its position as manager of AIChE's shows has in its possession any confidential information or information acquired at substantial expense which is not also available to the general public.[7] Under these circumstances Reber-Friel cannot be precluded from using that same information on the theory that it is an asset of AIChE. As stated in the case of *Abdallah v. Crandall*, 273 App.Div. 131, 133, 76 N.Y. S.2d 403, 406 (3d Dep't. 1948), in determining whether a customer list was a protectable asset: "A trade secret, like any other secret, is nothing more than private matter; something known to only one or a few and kept from the general public; and not susceptible to general knowledge." AIChE's frequent references to Reber-Friel's important position is also unavailing. New York cases make clear that a former employee should not be penalized for having held an executive position in a company if disclosure or use of confidential information is not threatened. *Reed, Roberts Assocs., Inc. v. Strauman, supra*, 40 N.Y.2d 303, 386 N.Y. S.2d 677, 353 N.E.2d 590; *Purchasing Asso-*

*ciates, Inc. v. Weitz, supra*, 13 N.Y.2d 267, 246 N.Y.S.2d 600, 196 N.E.2d 245; *Leo Silfen, Inc. v. Cream, supra*, 29 N.Y.2d 387, 328 N.Y.S.2d 423, 278 N.E.2d 636; *compare Bradford v. N. Y. Times Co.*, 501 F.2d 51 (2d Cir. 1974).

AIChE's claim that the covenant should be enforced to prevent Reber-Friel from profiting from relationships with exhibitors established while in its position as AIChE's trade show manager is also without merit. New York courts have upheld covenants prohibiting employees from soliciting former customers to the extent necessary to protect the good will of the employer. *E.g., Karpinski v. Ingrasci*, 28 N.Y.2d 45, 320 N.Y.S.2d 1, 268 N.E.2d 751 (1971); *Bates Chevrolet Corp. v. Haven Chevrolet, Inc.*, 13 A.D.2d 27, 213 N.Y.S.2d 577 (1st Dep't 1961), *aff'd*, 13 N.Y.2d 644, 240 N.Y.S.2d 759, 191 N.E.2d 290 (1963). In *USA Chem, Inc. v. Goldstein*, 512 F.2d 163, 167 (2d Cir. 1975) this court, upholding such a covenant, quoted the reasoning of the Texas Court of Appeals in *Grace v. Orkin Exterminating Co.*, 255 S.W.2d 279, 284 (Tex.Civ.App.1953), in further explaining the purpose of the rule:

> Covenants in favor of the former employer, restricting competition by a former employee after the employment has terminated, which lasted for a reasonable time and which operated over a reasonable area, have been specifically enforced by injunction in cases where the good will of the employer's customers had attached to the employee during the latter's employment and the employee thus had acquired during his employment a special influence with the customer which gave him an advantage over the employer in competition for the customer's business.

Assuming the continued validity in New York of this justification for restrictive covenants absent extenuating circum-

---

**7.** Notably, in August 1981 AIChE received from Reber-Friel the complete file on each past exhibitor containing correspondence and contracts. At the hearing on the preliminary injunction in late September AIChE did not make it clear whether it had referred at all to those files for information but it did not assert that there was any relevant information in those files that was not available through AIChE brochures and directories distributed to the public.

stances,[8] *but see Columbia Ribbon & Carbon Mfg. v. A–1–A Corp., supra,* 42 N.Y.2d 496, 398 N.Y.S.2d 1004, 369 N.E.2d 4, we conclude that New York courts would not accept such a justification in this case. In those cases where courts enforced restrictive covenants to prevent a former employee from unfairly profiting from the good will of the employer it was apparent that the good will was indeed an asset of the employer. The clearest case is that of the salesman whose acquisition of good will is dependent on the past and future performance of the product or service being sold. *Bates Chevrolet, supra,* 13 A.D.2d 27, 213 N.Y.S.2d 577. The same factor has been present and noted in other contexts as well. Thus, in *Millet v. Slocum,* 4 A.D.2d 528, 167 N.Y.S.2d 136 (4th Dep't. 1957), *aff'd,* 5 N.Y.2d 734, 177 N.Y.S.2d 716, 152 N.E.2d 672 (1958), the court upheld a restrictive covenant prohibiting a physician, a former partner, from performing surgery in a 25-mile radius. It noted that the clinic had been in operation since 1938 and had earned an excellent reputation and that as a member from 1949–1955 the expelled partner would acquire its confidence and good will. Similarly, in *Karpinski v. Ingrasci, supra,* 28 N.Y.2d at 50, 320 N.Y.S.2d at 5, 268 N.E.2d at 754, the court noted that it was "clear that nearly all of the defendant's practice was, and would be, directly attributable to his association with his former employer." *Accord, Gelder Medical Group v. Webber,* 41 N.Y.2d 680, 394 N.Y.S.2d 867, 363 N.E.2d 573 (1977); *Foster v. White,* 248 App.Div. 451, 290 N.Y.S. 394 (1936), *aff'd,* 273 N.Y. 596, 7 N.E.2d 710 (1937).

However, where it appeared that the person against whom the restrictive covenant was sought to be enforced brought with it to the enterprise much of the good will for which the enterprise is seeking protection, at least one New York court noted the inequity in enforcing such a covenant. In

*Lynch v. Bailey,* 275 App.Div. 527, 531–32, 90 N.Y.S.2d 359, 363 (1st Dep't), *aff'd,* 300 N.Y. 615, 90 N.E.2d 484 (1949), the Appellate Division refused to enforce a covenant against an accountant partner, an original member of the firm, noting among other things:

When the new firm was constituted, the parties entered into a joint venture to practice accountancy together, each one bringing his own clients, his own personal professional skill and reputation, his personal ability and his business associations.... But under the terms of the restrictive clause before us, an active partner such as plaintiff upon withdrawal receives nothing back for his contribution of good will. All that, including his own clientele, doubtless the net result of a lifetime of effort and practice in his chosen profession is supposed to remain with the new firm without any continuing participation interest whatever.

The holding in *Lynch v. Bailey* makes clear that there are no hard and fast rules to determine the validity of restrictive covenants. The court itself stated that it was not deciding "whether any agreement of a partner not to compete with his former partnership is void as opposed to public policy;" rather the only issue was "whether this particular agreement in the light of its extent, scope and purpose and all the facts and circumstances presented, is invalid and void." 275 A.D.2d at 530, 90 N.Y.S.2d at 362.

In assessing the covenant before us in light of the facts and circumstances of this case we find the equities presented resemble those in *Lynch v. Bailey.* Reber-Friel brought with it to this joint effort years of experience in the trade show management business, its business connections and its excellent reputation and used these talents successfully to create the AIChE shows. It also used its expertise and reputation as a

---

8. For instance, in *Molina v. Barany,* 56 N.Y.S.2d 124 (Sup.Ct.N.Y.Co.1945), the bad faith of the defendant was taken into consideration. And in *Service System Corp. v. Harris,* 41 A.D.2d 20, 341 N.Y.S.2d 702 (4th Dep't. 1973), the defendant not only demonstrated bad faith

but the court found his knowledge of trade secrets to be a factor. As stated in *Clark Paper & Mfg. Co. v. Stenacher,* 236 N.Y. 312, 321, 140 N.E. 708, 712 (1923): "Any unfair competition or practice may move equity to enforce a negative covenant."

general contractor for exhibitors and further developed its own good will in that regard. Indeed, much of AIChE's good will is directly attributable to the good will contributed by Reber-Friel upon joining AIChE and not that developed on behalf of AIChE thereafter. The extent to which Reber-Friel will benefit from good will belonging to AIChE does not under the circumstances presented justify enforcement of the restrictive covenant.[9]

AIChE has offered no evidence to show that it cannot fairly compete with Reber-Friel because of Reber-Friel's past relationship with exhibitors. The restrictive covenant has no legal justification. Its effect is merely "to remove from possible competition one whose knowledge and skill, acquired before he came into its employ, has been found valuable to it, and to prevent that same knowledge and skill being utilized for the benefit of himself and others, after he has ceased to be employed by plaintiff. Such a covenant is an unreasonable restraint of trade and competition, and will not be enforced in a court of equity." *Kaumagraph Co. v. Stampargraph Co.*, 197 App. Div. 66, 188 N.Y.S. 678 (1st Dep't. 1921), *aff'd*, 235 N.Y. 1, 138 N.E. 485 (1923).

## II. *Claims for Breach of Fiduciary Duty, Conversion and Unfair Competition*

■ AIChE claims that the district court erred in granting summary judgment dismissing AIChE's claims for breach of fiduciary duty, conversion and unfair competition based on Reber-Friel's alleged failure to return all documents in its possession produced in its management of AIChE's shows and for its alleged use of those docu-

ments for its own benefit. At the very least, AIChE argues, it "should be given the opportunity to explore thoroughly through discovery (1) exactly what exhibitor information Reber-Friel did produce as AIChE's agent and in what form, if any, Reber-Friel still retains that information; and (2) the extent to which Reber-Friel is and has been using such information in soliciting AIChE's exhibitors for the Chem Pro Show." (Brief for Appellant, p. 45).

At the hearing on the preliminary injunction plaintiff represented that as far as it knew defendant had at that point delivered to AIChE all information and documents accumulated in its management of AIChE's shows, with the exception of approximately 4,000 index cards each of which contained the names and addresses of potential exhibitors and the names and phone numbers of the individuals to contact at the exhibitors' offices. Upon the representation of Reber-Friel that it would immediately produce those cards, the court dismissed the claim for injunctive relief as moot.

AIChE did not offer any evidence to indicate that Reber-Friel was in possession of information that had not been provided to AIChE. A letter from plaintiff's to defendant's counsel dated September 3, 1981 submitted to suggest that Reber-Friel was withholding information, contains requests for information that already had been provided, was insignificant, or the whereabouts of which had been previously explained. And, in fact, with the exception of the index cards, further demand was not made for these items at the hearing held at the end of September. In addition, except for conclusory allegations of operating under

---

**9.** Neither were Reber-Friel's services special, unique or extraordinary so as to justify a restrictive covenant. In *Purchasing Assocs., Inc. v. Weitz, supra*, 13 N.Y.2d at 274, 246 N.Y.S.2d at 605, 196 N.E.2d at 249, the court stated:

> More must, of course, be shown to establish such a quality than that the employee excels at his work or that his performance is of high value to his employer. It must also appear that his services are of such character as to make his replacement impossible or that the loss of such services would cause the employer irreparable injury.

Clearly, Reber-Friel's services cannot be so described. Indeed, AIChE did not consider Reber-Friel irreplaceable and in fact had a replacement in place at the time of termination of Reber-Friel. As noted by the New York Court of Appeals in *American Broadcasting Companies, Inc. v. Wolf, supra*, 52 N.Y.2d at 403 n.6, 438 N.Y.S.2d at 486, 420 N.E.2d at 367, "no New York case has been found where enforcement [of a restrictive covenant] has been granted, following termination of the employment contract, solely on the basis of the uniqueness of the services."

impaired conditions AIChE did not make any showing of damages resulting from the delay in receiving material from Reber-Friel. Rather its allegations emphasized the superior position of Reber-Friel. Neither did the record support an inference that AIChE was damaged in any way. In the spring of 1981 Reber-Friel had delivered to AIChE computer printouts containing the names of exhibitors, addresses, and names of individuals to contact at the exhibitors' offices. Thus, except for the telephone numbers the information on the index cards was duplicative of that received months earlier. At the time of the hearing, AIChE executives testified, AIChE was still in the process of creating its own exhibitor list, using the list provided by Reber-Friel plus its own independent research. It had not yet procured phone numbers. In the spring of 1981, at the request of AIChE, Reber-Friel provided AIChE with its priority system for the assignment of exhibitor space plus an explanation of that system. Finally, in August 1981 Reber-Friel sent cartons of materials to AIChE, eleven of which contained exhibitor files in alphabetical order of correspondence and contracts with each exhibitor. In the absence of any specific allegation that AIChE has not received or does not have readily available to it relevant information or any specific allegation or evidence of damage, it was appropriate for the district court to dismiss the claim.

In support of its contention that Reber-Friel's alleged actual use of the documents containing information relating to AIChE's shows, even though not confidential, to solicit exhibitors for its own show amounted to breach of fiduciary duty and unfair competition AIChE cites the New York Court of Appeals in *Leo Silfen, Inc. v. Cream,* supra, 29 N.Y.2d at 391–92, 328 N.Y.S.2d at 426–27, 278 N.E.2d at 639. After holding that Cream could solicit former customers of Silfen because the names were not confidential the court stated:

Notably, plaintiffs did not attempt to sustain their allegation that Cream had made copies of plaintiff's secret and confidential files, ·or used the detail in those files with respect to each customer's 'profile'. The solicitation of plaintiffs' customers was at most the product of casual memory, or, as defendants would have the court believe, coincidence. *If there had been a physical taking or studied copying, the court may in a proper case enjoin solicitation, not necessarily as a violation of a trade secret, but as an egregious breach of trust and confidence while in plaintiffs' service.* (Emphasis added).

In the case cited by the court in support of its statement, *Scott & Co. v. Scott,* 186 App.Div. 518, 524–25, 174 N.Y.S. 583, 587 (1st Dep't. 1919), it was held that a salesman could solicit the trade of his employer's customers with whom he had done business even though the names of those customers were on a list given him by his employer, but could not "copy a list of the employer's customers, with whom he had no personal dealings, and use the list in either his own or another business in competition with his former employer." In *Silfen,* the defendant did not have direct contact with the plaintiff's customers and, therefore, except for casual memory, the plaintiff's files would have been the primary source of his information. In addition, as the court noted, the files in *Silfen* contained confidential information in addition to customers' names. The case before us differs significantly. Here Reber-Friel has had access to this information for the past twenty (20) years and has used and gathered the information not only in its capacity as AIChE's agent but as general contractor for exhibitors. In addition, much of the relevant information has been made available to the public through brochures and promotional materials. Reber-Friel's reference to the materials in its possession does not support a claim for breach of trust or unfair competition.[10]

10. In its request for information AIChE proceeded on the assumption that it is entitled to all material held by Reber-Friel relating to AIChE's shows, irrespective of form or content. We note that this case differs from that involving an employer/employee relationship, where

The pleadings, affidavits and evidence adduced before the district court failed to present a genuine issue of material fact. Summary judgment was appropriate. *S.E.C. v. Research Automation Corp.,* 585 F.2d 31 (2d Cir. 1978). The judgment is

Affirmed.

FEINBERG, Chief Judge (concurring):

I concur in Judge Mishler's opinion, dubitante, and with a sense of frustration. I say dubitante because Judge Mansfield's dissent is a strong one, and it is difficult to say with assurance whether his reading or Judge Mishler's reading of the New York precedents is correct. My sense of frustration is occasioned by the amount of time and effort that four federal judges (I include the trial judge) have now devoted in this case to the issue of whether, under New York law, plaintiff is entitled to injunctive relief, a question that is better answered by the state courts.

At a time when the civil caseload of the federal courts is at an all time high, when the filings in this circuit are reaching astronomical proportions, and when diversity cases comprise 25% of the civil cases commenced in the district courts and 18% of the civil appeals in the circuit courts,[1] the anomaly of diversity jurisdiction becomes increasingly apparent. Originally based upon the notion that an out-of-state litigant would encounter prejudice in a local state court but not in a federal forum, diversity jurisdiction in recent years has merely afforded attorneys and their clients another opportunity for forum shopping, a luxury the federal judicial system can no longer afford. In addition, the questions before us

can, of course, be answered authoritatively only by the judges of the highest court of the State of New York, presumably with less effort because of their greater familiarity with New York law. Thus, the New York courts could in an opinion at any time render largely irrelevant the interpretation of New York law reached by the majority today. And if enough time had gone by, plaintiff could obtain no redress for what by then would be seen as our error. *Factors, Etc., Inc. v. Pro Arts, Inc.,* 652 F.2d 278, 282 (2d Cir. 1981), cert. denied, —— U.S. ——, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982).[2]

Nor is such a result beyond the realm of possibility. Only last year in another diversity case two of my colleagues engaged in a long debate, consuming 12 pages of the Federal Reporter, Second Series, and untold hours of effort, over the issue of what the law of Tennessee provided ·with regard to the descendibility of the right of publicity and whether this court should defer to the Sixth Circuit's interpretation, as the court of appeals encompassing Tennessee, absent a controlling decision by the state court. *Factors, Etc., Inc. v. Pro Arts, Inc.,* supra. Barely three months later, a Tennessee court decided the issue, rendering both our decision and the Sixth Circuit's somewhat academic as a practical matter. *Commerce Union Bank v. Coors,* 7 Media L.Rep. 2204 (Tenn.Ch.Ct.1981).

My colleagues and I remain bound, of course, to give diversity cases careful consideration and will continue to do so until Congress reassesses the current utility of this grant of jurisdiction.

the employer is entitled to claim as his own that which is produced by the employee during working hours. In the case before us the duties of Reber-Friel for which it was being paid are clearly defined by the contract between Reber-Friel and AIChE. (See footnote 3, *supra*). While AIChE may have a right to information that was necessarily procured in performance of those duties, it is questionable whether it is entitled to information, forms and systems developed by Reber-Friel at its own expense for its own convenience to reduce its expenses.

1. Relevant statistical data supporting these assertions appear in Administrative Office of the United States Courts, 1981 Annual Report of the Director at 1, 3, 4, A–2, A–12.

2. Of course, plaintiff took this risk by deliberately choosing the federal forum, despite the ease with which plaintiff could have obtained an authoritative, conclusive determination in the state courts.

MANSFIELD, Circuit Judge (dissenting):

I respectfully dissent. The majority proceeds on the erroneous assumption that the restrictive covenant here must be treated the same as one of adhesion that might be extracted by a powerful employer from an employee, which will not be enforced by New York courts when it prevents the employee from earning his livelihood elsewhere. But no such circumstances are present here. The present covenant was agreed to after arm's-length bargaining between a trade association (AIChE) and a well-established independent corporate management organization (Reber) that will continue, as it has in the past, to derive the great majority of its profits from wholly unrelated clients. Moreover, enforcement of the covenant would not reduce competition but increase it by giving AIChE, which has never engaged in the trade show business except through Reber as its agent, a reasonable "starting time" period needed to enter the business on its own and compete against others in the petrochemical trade show business.

Therefore the reasoning which underlies New York's refusal to enforce such covenants in certain types of employer-employee cases has no application here. In any event Reber's refusal for a long period to turn over records belonging to AIChE was a clear breach of fiduciary duty, whether or not Reber be treated as an employee or corporate business organization, and the district court erred in dismissing the action summarily without trial of the factual issue of whether the damage caused by that breach was substantial. To permit Reber in the meantime to capitalize on its violation of the covenant and its breach of fiduciary duty by putting on its own petrochemical trade shows would clearly deal AIChE a blow, described by the district court as "moderate to devastating," which cannot adequately be compensated by money damages and threatens irreparable injury. For these reasons I would reverse the district court's orders and grant relief enforcing the covenant.

New York courts are quite willing to enforce covenants not to compete when, as here, an employer-employee relationship is not involved. In *Mohawk Maintenance Co., Inc. v. Kessler*, 52 N.Y.2d 276, 437 N.Y.S.2d 646, 419 N.E.2d 324 (1981), the court noted that

> "the inflexible approach of the judiciary to such agreements was relaxed to some extent as the courts came to realize that a blanket prohibition against agreements purporting to restrain trade was contrary to the equally strong public policy in favor of allowing individuals to dispose of their property freely and to enter into binding contracts.
>
> . . . .
>
> "Indeed, the modern trend in the case law seems to be in favor of according such covenants full effect when they are not unduly burdensome, particularly in cases where the agreement in question is made in connection with the sale of a business and its accompanying 'good will.'" *Id.* at 283–84, 437 N.Y.S.2d at 650, 419 N.E.2d at 328.

New York enforces covenants not to compete when entered into in conjunction with the sale of a business, *Mohawk Maintenance Co., Inc., supra,* or when they involve a professional such as a physician, *Gelder Medical Group v. Webber*, 41 N.Y.2d 680, 683, 394 N.Y.S.2d 867, 870, 363 N.E.2d 573, 576 (1977); *Karpinski v. Ingrasci*, 28 N.Y.2d 45, 49–50, 320 N.Y.S.2d 1, 4–5, 268 N.E.2d 751, 753–54 (1971).

Even when restrictive covenants are viewed in the employer-employee contexts New York holds that

> "no hard-and-fast rules have yet been formulated and courts have been continuously engaged in the ongoing task of determining what restrictions are reasonable given the peculiar circumstances and context of each individual case." *Sprinzen v. Nomberg*, 46 N.Y.2d 623, 628, 415 N.Y.S.2d 974, 976, 389 N.E.2d 456, 458 (1979).

Accord *Reed, Roberts Associates, Inc. v. Strauman*, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 679, 353 N.E.2d 590, 592–93 (1976).

Given the foregoing it is inappropriate for us to ignore the peculiar circumstances of this case and treat it as if it involved an employee's loss of his livelihood.[1] The reasons underlying New York's disapproval of employer-employee restrictive covenants are not present here.

The primary reason relied upon by the New York courts for limiting restrictive covenants in the employer-employee context is that "there are 'powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood.'" *Columbia Ribbon & Carbon Manufacturing Co., Inc. v. A–1–A Corp.*, 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 1006, 369 N.E.2d 4, 6 (1977). Clearly this factor is not present here. Reber is a business organization, not a single individual. Moreover, Reber has not shown that its corporate livelihood is at stake. Without producing any records it claims that it has earned about 30% of its profits on AIChE shows. The temporary loss by a firm of 30% of its profits, which might well be recouped by aggressively seeking new business in areas outside the petrochemical market (70% of its business has apparently been non-petrochemical), is much less serious than a salesman's loss of his livelihood when he is prevented from selling the one product with which he is familiar. Indeed, since two-thirds of the revenues which Reber derived from AIChE shows were from services sold directly to exhibitors, the 30% figure over-estimates the loss to Reber.

Even in the employer-employee context New York courts have enforced covenants not to compete when the covenants preclude the former employee from carrying on only a portion of his trade. *In Re Riccardi*, 45 A.D.2d 191, 197, 356 N.Y.S.2d 872, 879 (1st Dept. 1974) (employee prohibited from soliciting or servicing those who were customers of employer during period of agreement), *aff'd*, 36 N.Y.2d 945, 373 N.Y. S.2d 551, 335 N.E.2d 856 (1975); *Bates Chevrolet Corp. v. Haven Chevrolet, Inc.*, 13 A.D.2d 27, 30, 213 N.Y.S.2d 577, 581 (1st

Dept. 1961) (same), *aff'd*, 13 N.Y.2d 644, 240 N.Y.S.2d 759, 191 N.E.2d 290 (1963); *Cole Steel Equipment Co., Inc. v. Art-Lloyd Metal Products Corp.*, 1 A.D.2d 148, 150, 148 N.Y.S.2d 440, 441–42 (1st Dept. 1956) (per curiam) (covenant limited to the sale of two items out of the many defendant sold was enforced), *appeal dismissed*, 2 N.Y.2d 836, 159 N.Y.S.2d 973, 140 N.E.2d 869 (1957). Thus this covenant would be enforced by New York even if Reber were an employee rather than a company, since it remains free to manage trade shows on subjects other than petrochemicals as it has in the past.

New York courts have also given as a reason for disfavoring restrictive covenants in employment contracts that "robust and uninhibited competition should not give way merely because a particular employer wishes to insulate himself from competition." *American Broadcasting Co., Inc. v. Wolf*, 52 N.Y.2d 394, 404, 438 N.Y.S.2d 482, 487, 420 N.E.2d 363, 368 (1981). Here, however, robust competition is not threatened by enforcement of the covenant but, on the contrary, would probably be enhanced. AIChE, unlike the typical employer, was not itself in the market of putting on exhibitions except through Reber, upon which it relied totally. Thus this is not a case in which an aggressive employee is challenging his former established employer, with the latter attempting to avoid competition by hiding behind a restrictive covenant. This is a case in which a trade association has decided to enter the market for the first time in competition against others. Competition will be enhanced, not stifled, if parties like AIChE know that, should they decide to enter a market themselves, they can rely upon a covenant with their management company which will give them a reasonable period (3 years) to get established in the exhibition business by preventing that company (already established in the market) from using its past close relationship with them to undercut their entry.

---

1. Because each case must be judged on its facts, New York courts are reluctant to grant summary judgment even when the covenant not to compete is in an employment contract. *Wise v. Transco, Inc.*, 73 A.D.2d 1039, 425 N.Y.S.2d 434 (1980).

If such a covenant is not to be enforced a party like AIChE will be less likely to enter as a new competitor in the market-place.

Enforcement of the covenant not to compete here would have no anticompetitive effect in the exposition market, where there are many other participants. Failure to enforce it, however, could cripple AIChE's attempt to enter that market because Reber, through operation of a business owned by AIChE, has over the last 20 years built up contacts, good will, and knowledge of customer needs and habits that give it a distinct competitive advantage over AIChE. This is evidenced by Reber's footdragging in turning over essential customer data to AIChE until after AIChE had threatened to turn the matter over to legal counsel. (Even then Reber stalled, not turning over some documents until the day this action was filed.) If, as the majority argues, this information was all so public and available, why did Reber refuse for so long to turn it over and then initially turn over only exhibitors' names and addresses but carefully delete each telephone number? The answer lies in common knowledge that particularized knowledge, just like legal research, often takes a long time and considerable effort to assemble, even when it is publicly available in a library. Indeed Reber has undoubtedly pointed to this work as part of its valuable services rendered to AIChE in the past, for which it was paid. By withholding this information Reber was able to delay AIChE's competitive entry while Reber improperly used the same information for its own private purposes.

A final policy consideration that undoubtedly leads New York courts to disfavor restrictive covenants in the employer-employee context is that employees rarely have the same degree of bargaining power that their employers have. This factor is not present here; Reber and AIChE appear on this record to have equal bargaining power. The covenant was agreed to after arm's-length bargaining; it is not the product of overreaching by a powerful employer.

In the face of these clear distinguishing factors the majority offers no sound reasons of New York law supporting its treatment of this action as an employer-employee case. Like the district court it relies upon *Lynch v. Bailey,* 275 A.D. 527, 530–32, 90 N.Y.S.2d 359, 362–63 (1st Dept.), *aff'd,* 300 N.Y. 615, 90 N.E.2d 484 (1949), and *Capital Temporaries, Inc. v. Olsten Corp.,* 506 F.2d 658, 666 (2d Cir. 1974). But neither case supports the majority's holding. *Lynch* involved an attempt by an accounting firm to prevent a former partner from practicing that profession. Unlike Reber, the accountant in *Lynch* was completely prevented from practicing his profession. Furthermore, in *Lynch* the restrained party was a single individual, not a company. Thus *Lynch* can hardly support the majority's conclusion that companies or business organizations should be treated as if they were employees. Nor is *Capital Temporaries, Inc.* of any help. That case merely noted that the enforceability of a restrictive covenant in a franchisor-franchisee case is a matter of state law, not federal antitrust law. 506 F.2d at 666. In light of the legally significant differences between this case and employer-employee cases relied on by the majority, I see no reason to treat this case as an employer-employee case.

The district court rested its decision heavily upon what it conceived to be the excessive "world-wide" scope of the restrictive covenant in the present case, which contains no geographic bounds. Not having the benefit of recent New York law on the subject, it mistakenly concluded that New York law precluded it from limiting the geographic scope of the covenant and permitted it only to strike "grammatically severable" portions of a contract, which is not possible in the present case. Apparently recognizing that New York law now permits a court to reform or restrict a covenant found to be unreasonable in geographic scope, the majority has wisely chosen not to espouse that ground. Recent decisions establish that enforcement of the covenant here would not be denied on the ground that its geographic scope might be unreasonable. In *Deborah Hope Doelker, Inc. v. Kestly,* 449 N.Y.S.2d

52 (App.Div. 1st Dept.), the court held that when "an otherwise valid restrictive covenant does not contain a geographic limitation, the court may, if warranted by equity . . . interpret the clause in conformity with the intent of the parties." Determining that the intent of the parties was that the geographic scope of the covenant be the area within a 50-mile radius of New York City, even though the contract, like the instant one, was silent on the subject, the court enforced the covenant as limited. In *Borne Chemical Co., Inc. v. Dictrow*, A.D., 445 N.Y.S.2d 406 (2d Dept. 1981), which involved a sale of a business and an employment relationship, the covenant barred the defendant from working anywhere in the United States where the employer-buyer was in business. The employer-buyer sought an injunction only for the area within a 150-mile radius of one of its offices, and the court, finding the narrowed scope reasonable, enforced the covenant. Under these decisions the district court would not be prevented from limiting the geographic scope of the present covenant to the United States where the exhibitions, which attract *national* exhibitors, are held.

The covenant before us is reasonable. Since it runs for a period of three years, at most only two of the shows proposed by Reber in violation of it will be precluded. The covenant is needed by AIChE to allow it a reasonable "start-up time" to enter the trade show business on its own without competition from Reber, its former *alter ego*. Under *Kestly, supra*, and *Dictrow, supra*, its geographic scope can be limited to the United States, a quite reasonable range in the trade show market. Judged under the standards appropriate in this context, the covenant should in my view be enforced.

Even assuming that this were an employer-employee case, summary judgment for Reber would in any event be inappropriate. The covenant here would be enforceable against an employee because it would not prevent him from engaging in his trade, but would only prevent him or her from dealing in one lesser segment of that trade. *In Re Riccardi, supra; Bates Chevrolet Corp. v.*

*Haven Chevrolet, Inc., supra; Cole Steel Equipment Co., Inc. v. Art-Lloyd Metal Products Corp., supra.* Moreover, New York courts will enforce a covenant not to compete when necessary "to protect . . . the goodwill of the employer's business." *American Broadcasting Co., Inc. v. Wolf, supra*, 52 N.Y.2d at 403, 438 N.Y.S.2d at 486, 420 N.E.2d at 367. Since the covenant's effect on Reber's ability to do business is limited, AIChE's interest in protecting its good will is entitled to even greater weight as worthy of protection. The majority, relying on *Lynch v. Bailey, supra*, 275 A.D. 527, 90 N.Y.S.2d 359, rejects this reasoning on the theory that Reber "brought with it to the enterprise much of the good will for which the enterprise is seeking protection." (At 389). *Lynch*, however, has no application here. There the former accounting partner against whom his firm sought to enforce a covenant not to compete had been one of the founding members of the firm and had brought many clients to the firm. When the accountant left the firm these clients attempted to follow him, desiring his, not the firm's, services, but the covenant prevented him from taking this work. On leaving the firm the accountant was not compensated for the good will that he had contributed to it and was now losing. Thus the good will that the partnership was attempting to "protect" was not its own but that contributed by the former partner. Understandably, there, the court was unwilling to enforce the covenant.

By contrast, there is no evidence that Reber brought with it to AIChE any good will already established with petrochemical or refining engineers or concerns. It was hired and paid to develop the good will of AIChE as a sponsor of petrochemical trade shows, exploiting the good will which AIChE already had in the industry as a professional organization. While Reber had undoubtedly developed good will among non-petrochemical trade show sponsors as a trade show manager, there has been no showing that it brought any clients with it when it was hired by AIChE. The majori-

ty's bland assertion that "much of AIChE's good will is directly attributable to the good will contributed by Reber-Friel upon joining AIChE and not that developed on behalf of AIChE thereafter" (At 390), is not supported by any evidence and there was no such finding by the district court. It is improper for us to decide such an important contested factual issue which was never resolved below since the district court granted summary judgment without giving the plaintiff an opportunity to litigate it.

The majority's claim that this covenant has no purpose other than to restrain competition is belied by the record. By now seeking to promote its own petrochemical trade show after having served as the managing agent of AIChE's petrochemical show for over 20 years, and by doing so in violation of a covenant not to do so, Reber is attempting to borrow on the good will that AIChE developed through it over that period. Reber is particularly well situated to pirate away AIChE's good will because during that 20-year period Reber *was* AIChE for purposes of trade shows. AIChE's legitimate interest in protecting its own good will, an interest recognized by New York, and the reasonableness of the covenant, which eliminates only a small portion of the overall trade show market from Reber, mandate enforcement of the covenant, even assuming *arguendo* that Reber was an employee rather than a corporate business organization.

AIChE also claims breach of fiduciary duty, conversion, and unfair competition, none of which were discussed in the district court's opinion granting summary judgment. In *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 328 N.Y.S.2d 423, 278 N.E.2d 636 (1972), the New York Court of Appeals noted that when

"there has been a physical taking or studied copying, the court may in a proper case enjoin solicitation, not necessarily as a violation of a trade secret, but as an egregious breach of trust and confidence

while in plaintiffs' service." *Id.* at 391–92, 328 N.Y.S.2d at 427, 278 N.E.2d at 639.

Accord *Tour and Study, Inc. v. Hepner*, 77 A.D.2d 843, 432 N.Y.S.2d 148 (1st Dept. 1980); *Continental Dynamics Corp. v. Kanter*, 64 A.D.2d 975, 408 N.Y.S.2d 801 (2d Dept. 1978); *Lincoln Steel Products, Inc. v. Schuster*, 49 A.D.2d 618, 371 N.Y.S.2d 157 (2d Dept.), *appeal dismissed*, 38 N.Y.2d 738, 381 N.Y.S.2d 41, 343 N.E.2d 759 (1975); cf. *Reidman Agency, Inc. v. Musnicki*, 79 A.D.2d 1094, 435 N.Y.S.2d 837 (4th Dept. 1981) (when defendant "lawfully had possession" of documents and surrendered them, no injunction would issue).

Reber was in possession of AIChE customer lists and other information only because it had been chosen by AIChE to be its agent. Its refusal to turn over those records to AIChE amounted to a clear breach of fiduciary duty. If it used the records to further its own trade show, the breach was even more egregious. In either case an injunction is appropriate. I cannot agree with the majority's implicit suggestion (At 391–392 & n.10) that because the relationship between AIChE and Reber was not that of employer-employee Reber had more of a right to withhold documents pertaining to the shows than would an employee. Aside from the inconsistency between that suggestion and the majority's position elsewhere to the effect that Reber must be treated as an employee, surely neither a fiduciary nor an employee has any property interest in his employer's records, even if the employee developed the business from "scratch." I am at a loss to understand why the majority seems to assume that Reber had such an interest when even Reber, by finally turning over the records, seems to have recognized that it did not. The silence of the contract on this matter only confirms the point, for only a contractual provision could have given Reber the right to keep these records.[2]

---

2. The majority asserts that some of the records withheld may have been developed by Reber in the course of its independent service work for exhibitors. Reber has never claimed that

AIChE sought such documents, and I am unable to find any evidence in the record supporting this assertion.

The majority's further attempt to narrow *Silfen* by suggesting that there is some significance to the fact that the defendant there had no contact with customers is unpersuasive. Taking or copying of a principal's customer lists and other records by an agent would be a breach of fiduciary duty in either case. Nor do I find persuasive the majority's claim that the files in *Silfen* contained confidential information in addition to customer lists. The documents involved in *Silfen* appear to have contained nothing more secret than information about customers; similar information was contained in the files Reber withheld. Thus summary judgment for Reber was inappropriate on this ground as well.

The final issue is whether the district court properly denied preliminary injunctive relief. The record establishes that AIChE has shown probable success on the merits. The question is whether it showed "possible irreparable injury." *Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272, 276 (2d Cir. 1981); *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358 (2d Cir. 1976); *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973). See generally, *Carey v. Klutznick*, 637 F.2d 834, 837 (2d Cir. 1980); *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam). On review we must determine whether the district judge abused his discretion or made a mistake of law. *Vidal Sassoon, Inc., supra*, 661 F.2d at 276; *Union Carbide Agricultural Products Co., Inc. v. Costle*, 632 F.2d 1014, 1017 (2d Cir. 1980); *Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d Cir. 1979); *Triebwasser & Katz, supra*, 535 F.2d at 1358.

The district judge concluded that AIChE had not shown possible irreparable injury, stating that "the anticipated 'moderate to devastating' impact is too vague and speculative to constitute irreparable harm." AIChE proved that it and Reber are competing in the same market, each attempting to convince the same exhibitors to spend part of their limited promotional budgets on a particular trade show. Reber has the advantage, derived solely from its contract with AIChE, of closer relationships to clients with whom AIChE should have the stronger connection, those who had exhibited at prior AIChE shows. Reber had subverted AIChE's efforts to promote its shows by wrongfully withholding important business records. At the time of the hearing the sales of the CPE trade show were running 30% below normal. Given that AIChE is in effect a new entrant, the failure of CPE would have a negative effect on AIChE's reputation and good will, a blow from which it might take a substantial period of time to recover. Such injury cannot be adequately compensated by the later award of money damages, for it will be extremely difficult to determine how successful AIChE's shows would have been had Reber not breached the contract. There is nothing "vague" or "speculative" about this injury.

In my view the district court clearly erred in denying preliminary injunctive relief. I would reverse the order granting summary judgment to Reber and the order denying AIChE a preliminary injunction and direct the entry of preliminary relief.