OPINION OF THE COURT
Chief Judge Cooke.
This case provides an interesting insight into the fierce competition in the television industry for popular performers and favorable ratings.- It requires legal resolution of a rather novel employment imbroglio.
The issue is whether plaintiff American Broadcasting Companies, Incorporated (ABC), is entitled to equitable relief against defendant Warner Wolf, a New York City sportscaster, because of Wolf’s breach of a good faith negotiation provision of a now expired broadcasting contract with ABC. In the present circumstances, it is concluded that the equitable relief sought by plaintiff — which would have the effect of forcing Wolf off the air — may not be granted.
I.
Warner Wolf, a sportscaster who has developed a rather colorful and unique on-the-air personality, had been employed by ABC since 1976. In February, 1978, ABC and Wolf entered into an employment agreement which, following exercise of a renewal option, was to terminate on March 5, 1980. The contract contained a clause, known as a good-faith negotiation and first-refusal provision, that is at the crux of this litigation: “You agree, if we so elect, during the last ninety (90) days prior to the expiration of the extended term of this agreement, to enter into good faith negotiations with us for the extension of this agreement on mutually agreeable terms. You further agree that for the first forty-five (45) days of this renegotiation period, *398 you will not negotiate for your services with any other person or company other than WABC-TV or ABC. In the event we are unable to reach an agreement for an extension by the expiration of the extended term hereof, you agree that you will not accept, in any market for a period of three (3) months following expiration of the extended term of this agreement, any offer of employment as a sportscaster, sports news reporter, commentator, program host, Or analyst in broadcasting (including television, cable television, pay television and radio) without first giving us, in writing, an opportunity to employ you on substantially similar terms and you agree to enter into an agreement with us on such terms.” Under this provision, Wolf was bound to negotiate in good faith with ABC for the 90-day period from December 6, 1979 through March 4, 1980. For the first 45 days, December 6 through January 19, the negotiation with ABC was to be exclusive. Following expiration of the 90-day negotiating period and the contract on March 5, 1980, Wolf was required, before accepting any other offer, to afford ABC a right of first refusal; he could comply with this provision either by refraining from accepting another offer or by first tendering the offer to ABC. The first-refusal period expired on June 3, 1980 and on June 4 Wolf was free to accept any job opportunity, without obligation to ABC.
Wolf first met with ABC executives in September, 1979 to discuss the terms of a renewal contract. Counterproposals were exchanged, and the parties agreed to finalize the matter by October 15. Meanwhile, unbeknownst to ABC, Wolf met with representatives of CBS in early October. Wolf related his employment requirements and also discussed the first refusal-good faith negotiation clause of his ABC contract. Wolf furnished CBS a copy of that portion of the ABC agreement. On October 12, ABC officials and Wolf met, but were unable to reach agreement on a renewal contract. A few days later, on October 16 Wolf again discussed employment possibilities with CBS.
Not until January 2, 1980 did ABC again contact Wolf. At that time, ABC expressed its willingness to meet substantially all of his demands. Wolf rejected the offer, how *399 ever, citing ABC’s delay in communicating with him and his desire to explore his options in light of the impending expiration of the 45-day exclusive negotiation period.
On February 1,1980, after termination of that exclusive period, Wolf and CBS orally agreed oh the terms of Wolf’s employment as sportscaster for WCBS-TV, a CBS-owned affiliate in New York. During the next two days, CBS informed Wolf that it had prepared two agreements and divided his annual compensation between the two: one covered his services as an on-the-air sportscaster, and the other was an off-the-air production agreement for sports specials Wolf was to produce. The production agreement contained an exclusivity clause which barred Wolf from performing “services of any nature for” or permitting the use of his “name, likeness, voice or endorsement by, any person, firm or corporation” during the term of the agreement, unless CBS consented. The contract had an effective date of March 6, 1980.
Wolf signed the CBS production agreement on February 4, 1980. At the same time, CBS agreed in writing, in consideration of $100 received from Wolf, to hold open an offer of employment to Wolf as sportscaster until June 4, 1980, the date on which Wolf became free from ABC’s right of first refusal. The next day, February 5, Wolf submitted a letter of resignation to ABC.
Representatives of ABC met with Wolf on February 6 and made various offers and promises that Wolf rejected. Wolf informed ABC that they had delayed negotiations with him and downgraded his worth. He stated he had no future with the company. He told the officials he had made a “gentlemen’s agreement” and would leave ABC on March 5. Later in February, Wolf and ABC agreed that Wolf would continue to appear on the air during a portion of the first-refusal period, from March 6 until May 28.[1]
ABC commenced this action on May 6, 1980, by which *400 time Wolf’s move to CBS had become public knowledge. The complaint alleged that Wolf, induced by CBS, breached both the good-faith negotiation and first-refusal provisions of his contract with ABC. ABC sought specific enforcement of its right of first refusal and an injunction against Wolf’s employment as a sportscaster with CBS.
After a trial, Supreme Court found no breach of the contract, and went on to note that, in any event, equitable relief would be inappropriate. A divided Appellate Division, while concluding that Wolf had breached both the good-faith negotiation and first-refusal provisions, nonetheless affirmed on the ground that equitable intervention was unwarranted. There should be an affirmance.
II.
Initially, we agree with the Appellate Division that defendant Wolf breached his obligation to negotiate in good faith with ABC from December, 1979 through March, 1980. When Wolf signed the production agreement with CBS on February 4, 1980, he obligated himself not to render services “of any nature” to any person, firm or corporation on and after March 6, 1980. Quite simply, then, beginning on February 4 Wolf was unable to extend his contract with ABC; his contract with CBS precluded him from legally serving ABC in any capacity after March 5. Given Wolf’s existing obligation to CBS, any negotiations he engaged in with ABC, without the consent of CBS, after February 4 were meaningless and could not have been in good faith.
At the same time, there is no basis in the record for the Appellate Division’s conclusion that Wolf violated the first-refusal provision by entering into an oral sportscasting contract with CBS on February 4. The first-refusal provision required Wolf, for a period of 90 days after termination of the ABC agreement, either to refrain from accepting an offer of employment or to first submit the offer to ABC for its consideration. By its own terms, the right of first refusal did not apply to offers accepted by Wolf prior to the March 5 termination of the ABC employment contract. It is apparent, therefore, that Wolf could not have breached the right of first refusal by accepting an offer *401 during the term of his employment with ABC.[2] Rather, his conduct violates only the good-faith negotiation clause of the contract. The question is whether this breach entitled ABC to injunctive relief that would bar Wolf from continued employment at CBS.[3] To resolve this issue, it is necessary to trace the principles of specific performance applicable to personal service contracts.
III.
-A-
Courts of equity historically have refused to order an individual to perform a contract for personal services (e.g., 4 Pomeroy, Equity Jurisprudence [5th ed], § 1343, at pp 943-944; 5A Corbin, Contracts, § 1204; see Haight v Badgeley, 15 Barb 499; Willard, Equity Jurisprudence, at pp 276-279). Originally this rule evolved because of the inherent difficulties courts would encounter in supervising the performance of uniquely personal efforts[4] (e.g., 4 *402 Pomeroy, Equity Jurisprudence, § 1343; 5A Corbin, Contracts, § 1204; see, also, De Rivafinoli v Corsetti, 4 Paige Ch 264, 270). During the Civil War era, there emerged a more compelling reason for not directing the performance of personal services: the Thirteenth Amendment’s prohibition of involuntary servitude. It has been strongly suggested that judicial compulsion of services would violate the express command of that amendment[5] (Arthur v Oakes, 63 F 310, 317; Stevens, Involuntary Servitude by Injunction, 6 Corn LQ 235; Calamari & Perillo, The Law of Contracts [2d ed], § 16-5). For practical, policy and constitutional reasons, therefore, courts continue to decline to affirmatively enforce employment contracts.
Over the years, however, in certain narrowly tailored situations, the law fashioned other remedies for failure to perform an employment agreement. Thus, where an employee refuses to render services to an employér in violation of an existing contract, and the services are unique or extraordinary, an injunction may issue to prevent the employee from furnishing those services to another person for the duration of the contract (see, e.g., Shubert Theatrical Co. v Gallagher, 206 App Div 514). Such “negative enforcement” was initially available only when the employee had expressly stipulated not to compete with the employer for the term of the engagement (see, e.g., Lumley v Wagner, 1 DeG M & G 604, 42 Eng Rep 687; Shubert Theatrical Co. v Rath, 271 F 827, 830-883; 4 Pomeroy, Equity Jurisprudence [5th ed], § 1343, at p 944). Later cases permitted injunctive relief where the circumstances justified implication of a negative covenant (see, e.g., Montague v Flockton, LR 16 Eq 189 [1873], 4 Pomeroy, Equity Jurisprudence [5th ed], § 1343; 5A Corbin, Contracts, § 1205). In these situations, an injunction is warranted because the employee either expressly or by clear implication agreed not to work elsewhere *403 for the period of his contract. And, since the services must be unique before negative enforcement will be granted, irreparable harm will befall the employer should the employee be permitted to labor for a competitor (see 5A Corbin, Contracts, § 1206, at p 412).
-B-
After a personal service contract terminates, the availability of equitable relief against the former employee diminishes appreciably. Since the period of service has expired, it is impossible to decree affirmative or negative specific performance. Only if the employee has expressly agreed not to compete with the employer following the term of the contract, or is threatening to disclose trade secrets or commit another tortious act, is injunctive relief generally available at the behest of the employer (see, e.g., Reed, Roberts Assoc. v Strauman, 40 NY2d 303; Purchasing Assoc. v Weitz, 13 NY2d 267; Town & Country House & Home Serv. v Newbery, 3 NY2d 554). Even where there is an express anticompetitive covenant, however, it will be rigorously examined and specifically enforced only if it satisfies certain established requirements (see, e.g., Reed, Roberts Assoc. v Strauman, supra, at pp 307-308; Purchasing Assoc. v Weitz, supra, at pp 272-273; see, generally, Calamar! & Perillo, The Law of Contracts [2d ed], §16-19, at pp 601-602). Indeed, a court normally will not decree specific enforcement of an employee’s anticompetitive covenant unless necessary to protect the trade secrets, customer lists or good will of the employer’s business, or perhaps when the employer is exposed to special harm because of the unique nature of the employee’s services[6] (see, e.g., Reed, Roberts Assoc. v Strauman, supra, at p 308; Purchasing Assoc. v Weitz, supra, at pp 272-273; Lepel High Frequency Labs. v Capita, 278 NY 661, affg 253 App Div 799; 6A Corbin, Contracts, § 1394). And, an otherwise valid covenant will *404 not be enforced if it is unreasonable in time, space or scope or would operate in a harsh or oppressive manner (e.g., Reed, Roberts Assoc. v Strauman, 40 NY2d, at p 307, supra; Clark Paper & Mfg. Co. v Stenacher, 236 NY 312; 6A Corbin, Contracts, § 1394). There is, in short, general judicial disfavor of anticompetitive covenants contained in employment contracts (e.g., Reed, Roberts Assoc. v Strauman, supra, at p 307).
Underlying the strict approach to enforcement of these covenants is the notion that, once the term of an employment agreement has expired, the general public policy favoring robust and uninhibited competition should not give way merely because a particular employer wishes to insulate himself from competition (e.g., Clark Paper & Mfg. Co. v Stenacher, 236 NY 312, 319-320, supra; 6A Corbin, Contracts, § 1394, at p 100). Important, too, are the “powerful considerations of public policy which militate against sanctioning the loss of a man’s livelihood” (Purchasing Assoc. v Weitz, 13 NY2d, at p 272, supra). At the same time, the employer is entitled to protection from unfair or illegal conduct that causes economic injury. The rules governing enforcement of anticompetitive covenants and the availability of equitable relief after termination of employment are designed to foster these interests of the employer without impairing the employee’s ability to earn a living or the general competitive mold of society.
-C-
Specific enforcement of personal service contracts thus turns initially upon whether the term of employment has expired. If the employee refuses to perform during the period of employment, was furnishing unique services, has expressly or by clear implication agreed not to compete for the duration of the contract and the employer is exposed to irreparable injury, it may be appropriate to restrain the employee from competing until the agreement expires. Once the employment contract has terminated, by contrast, equitable relief is potentially available only to prevent injury from unfair competition or similar tortious behavior or to enforce an express and valid anticompetitive covenant. In *405 the absence of such circumstances, the general policy of unfettered competition should prevail.
IV.
Applying these principles, it is apparent that ABC’s request for injunctive relief must fail. There is no existing employment agreement between the parties; the original contract terminated in March, 1980. Thus, the negative enforcement that might be appropriate during the term of employment is unwarranted here. Nor is there an express anticompetitive covenant that defendant Wolf is violating, or any claim of special injury from tortious conduct such as exploitation of trade secrets. In short, ABC seeks to premise equitable relief after termination of the employment upon a simple, albeit serious, breach of a general contract negotiation clause.[7] To grant an injunction in that situation would be to unduly interfere with an individual's livelihood and to inhibit free competition where there is no corresponding injury to the employer other than the loss of a competitive edge. Indeed, if relief were granted here, any breach of an employment contract provision relating to renewal negotiations logically would serve as the basis for an open-ended restraint upon the employee’s ability to earn a living should he ultimately choose not to extend his employment.[8] Our public policy, which favors the free exchange of goods and services through established market mechanisms, dictates otherwise.
*406 Equally unavailing is ABC’s request that the court create a noncompetitive covenant by implication. Although in a proper case an impliecl-in-fact covenant not to compete for the term of employment may be found to exist, anticompetitive covenants covering the postemployment period will not be implied.[9] Indeed, even an express covenant will be scrutinized and enforced only in accordance with established principles.
This is not to say that ABC has not been damaged in some fashion or that Wolf should escape responsibility for the breach of his good-faith negotiation obligation.[10] Rather, we merely conclude that ABC is not entitled to equitable relief. Because of the unique circumstances presented, however, this decision is without prejudice to ABC’s right to pursue relief in the form of monetary damages, if it be so advised.
Accordingly, the order of the Appellate Division should be affirmed.

. The agreement also provided that on or after June 4, 1980 Wolf was free to “accept an offer of employment with anyone of [his] choosing and immediately begin performing on-air services.” The parties agreed that their rights and obligations under the original employment contract were in no way affected by the extension of employment.

. In any event, the carefully tailored written agreement between Wolf and CBS consisted only of an option prior to June 4, 1979. Acceptance of CBS’s offer of employment as a sportscaster did not occur until after the expiration of the first-refusal period on June 4, 1979.

. In its complaint, ABC originally sought specific enforcement of the right of first refusal. ABC now suggests that Wolf be enjoined from performing services for CBS’for a two-year period. Alternatively, ABC requests this court to “turn the clock back to February 1, 1980” by: (1) setting aside Wolf’s agreement with CBS and enjoining CBS from enforcing the agreement; (2) ordering Wolf to enter into good-faith negotiations with ABC for at least the period remaining under the negotiation clause when Wolf breached it; (3) ordering Wolf to honor the 90-day first-refusal period should the parties fail to reach agreement; and (4) enjoining CBS from negotiating with Wolf “for a period sufficient to render meaningful the above-described relief”.

. The New York Court of Chancery in De Rivafinoli v Corsetti (4 Paige Ch 264, 270) eloquently articulated the traditional rationale for refusing affirmative enforcement of personal service contracts: “I am not aware that any officer of this court has that perfect knowledge of the Italian language, or possesses that exquisite sensibility in the auricular nerve which is necessary to understand, and to enjoy with a proper zest, the peculiar beauties of the Italian opera, so fascinating to the fashionable world. There might be some difficulty, therefore, even if the defendant was compelled to sing under the direction and in the presence of a master in chancery, in ascertaining whether he performed his engagement according to its spirit and intent. It would also be very difficult for the master to determine what effect coercion might produce upon the defendant’s singing, especially in the livelier airs; although the fear *402 of imprisonment would unquestionably deepen his seriousness in the graver parts of the drama. But one thing at least is certain; his songs will be neither comic, or even semi-serious, while he remains confined in that dismal cage, the debtor’s prison of New York.”

. It is well established that legislative enactments may not coerce performance of services by penalizing nonperformance (e.g., People v Lavender, 48 NY2d 334, 338-339).

. Although an employee’s anticompetitive covenant may be enforceable where the employee’s services were special or unique (Reed, Roberts Assoc. v Strauman, 40 NY2d 303, 308, supra; Purchasing Assoc. v Weitz, 13 NY2d 267, 272-273, supra), no New York case has been found where enforcement has been granted, following termination of the employment contract, solely on the basis of the uniqueness of the services.

. Even if Wolf had breached the first-refusal provision, it does not necessarily follow that injunctive relief would be available. Outside the personal service area, the usual equitable remedy for breach of a first-refusal clause is to order the breaching party to perform the contract with the person possessing the first-refusal right (e.g., 5A Corbin, Contracts, § 1197, at pp 377-378). When personal services are involved, this would result in an affirmative injunction ordering the employee to perform services for plaintiff. Such relief, as discussed, cannot be granted.

. Interestingly, the negative enforcement ABC seeks — an injunction barring Wolf from broadcasting for CBS — is for a two-year period. ABC’s request is premised upon the fact that Wolf and CBS entered into a two-year agreement. Had the agreement been for 10 years, presumably ABC would have requested a 10-year restraint. In short, since it lacks an express anticompetitive clause to enforce, plaintiff seeks to measure its relief in a manner unrelated to the breach or the injury. This well illustrates one of the reasons why the law requires an express anticompetitive clause before it will restrain an employee from competing after termination of the employment.

. Of course, as discussed, tortious interference with the employer’s business by a former employee may sometimes be enjoined absent a noncompetitive covenant.

. It should be noted that the dissenter would ground relief upon the first-refusal clause, a provision of the contract that defendant did not breach. The dissenting opinion fails to specify why the first-refusal clause — or for that matter any other provision of the contract that defendant did not breach — is relevant in determining the availability of equitable relief. And, while the dissent correctly noted the flexibility of equitable remedies, this does not mean that courts of equity totally dispense with governing rules. Our analysis of the relevant principles, guided by important underlying policy considerations, reveals that this case falls well beyond the realm where equitable intervention would be permissible.
The dissenting opinion would now create a new agreement for the parties, and apply the first-refusal clause backwards into the period of the ABC employment, under the guise of equitable interpretation. Although the reach of equity may be broad, so far as we are aware equitable principles have never sanctioned the creation of a new and different contract between sophisticated parties merely to condemn conduct which was permissible under an actual written agreement.