CONSOLIDATED BRANDS, INC., Plaintiff,

v.

Nicholas A. MONDI, Dominick F. Mondi, Patricia Yates, Salvatore Pelleriti and Brunswick Beverages, Ltd., Defendants.

No. 86 CV 1305.

United States District Court, E.D. New York.

June 16, 1986.

Winick & Rich, P.C., New York City, for plaintiff, by Richard M. Howard.

Thomas J. Shamy, New Brunswick, N.J., for defendants.

PLATT, District Judge.

## INTRODUCTION

This action containing seventeen claims for relief sounding in misappropriation of trade secrets, unfair competition, defamation, interference with contract and conversion of property was commenced on April 23, 1986 with the filing of the complaint and an order to show cause for a preliminary injunction. The jurisdiction of this Court was invoked under the diversity statute, 28 U.S.C. § 1332(a) (1982), the plaintiff being a New York corporation and the defendants all residing or doing business in New Jersey with the exception of Dominick Mondi, a resident of California. The amount in controversy, exclusive of interest and costs, exceeds $10,000. Venue in the Eastern District of New York is proper pursuant to 28 U.S.C. § 1391(a) (1982).

The order to show cause was returnable on May 2, 1986. At that time the Court conducted a condensed hearing during which both sides offered testimony and documentary evidence in support of its position. The Court reserved decision and now considers the matter.

## BACKGROUND

The facts precipitating this law suit must be sketched briefly. The plaintiff is a New York corporation engaged in the distribution of food products and the manufacturing and selling of fountain syrups. In December 1982 Consolidated Brands, Inc. (CBI) purchased all of the assets of Somerset Syrups (Somerset), a small competitor servicing approximately 300 customers in central New Jersey. Somerset was wholly owned by Dominick Mondi and at the time of the sale was being run entirely by his son Nicholas Mondi (Nicholas). Tr. at 46. The purchase price was $100,000, of which $65,000 was allocated to the customer list[1]

---

1. This figure cannot be considered as a true valuation of the list because such allocations of

"developed by *Somerset* after years of arduous effort." Aff. of Anthony Forgione, Pres., CBI, at ¶ 8 (emphasis added). The sale was partially structured as a four-year lease of Somerset's premises at $2,000 per month with an agreement to sell on January 3, 1987 for $110,000.[2] Pl's Exs. 2 & 3. The sales contract between the corporations, which was signed by Dominick Mondi as President, contained a restrictive covenant prohibiting the seller from engaging in the same business within a 50–mile radius for four years. Pl's Ex. 4.

After the sale of Somerset, Nicholas Mondi was retained as the branch manager of CBI's new Somerset division and remained in its employ for four months. Initially Nicholas was given a written contract with a restrictive covenant but after consulting with his attorney he never executed it. Tr. at 49. After four months Nicholas left CBI and embarked upon a hot dog stand venture, but in nine months found himself unemployed. CBI was eager to rehire him at that time because business in its Somerset division was flagging. The number of customers had dipped from 300 to about 175 because, Nicholas testified, according to Mr. Horne, an officer of CBI, "the person in charge couldn't handle it, didn't know the business at that time, and he wanted me [Nicholas] to come back knowing the business in the area, to rebuild,—and the customers, to rebuild that business for him." Tr. at 50.

Nicholas agreed to return and from 1984 to April 1986 he was employed as a salesman at a salary of $200 per week.[3] No contract was ever signed defining this employment relationship. During the two

years that Nicholas worked for CBI as a sales person the number of customers climbed from 175 to 250 or 275. Tr. at 52. The employment relationship appeared to be satisfactory until a dispute arose between Nicholas and CBI regarding the sale of Somerset's real property to CBI as scheduled in the 1982 contract.[4] The dispute led to Mondi's termination on April 1, 1986. Two weeks later he, along with Patricia Yates (Yates) and Salvatore Pelleriti (Pelleriti), two other former CBI employees, formed a new company, Brunswick Beverages, Ltd.,[5] and began soliciting former Somerset customers. According to the plaintiff, in doing so defendant Mondi breached a restrictive covenant and all three defendants breached their fiduciary duties by misappropriating CBI's confidential information. Additionally, CBI claims that the defendants spread false and defamatory information that plaintiff had gone out of business and that they criminally converted CBI's $CO_2$ tanks. To put an immediate halt to this behavior plaintiff brought this application for a preliminary injunction.

## DISCUSSION

The law in the Second Circuit governing the granting of a preliminary injunction is now well settled. In *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1359 (2d Cir.1976), the Court of Appeals acknowledged that irreparable harm is "a fundamental and traditional requirement of all preliminary relief," citing *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931, 95 S.Ct. 2561, 2567, 45 L.Ed.2d 648

---

a purchase price of a business are primarily guided by tax considerations. Tr. at 87.

**2.** The delayed sale of the real estate was due to the fact that in 1982 Dominick Mondi was experiencing marital problems and did not wish to liquidate all of his personal assets at that time. Tr. at 8.

**3.** When Nicholas was first hired as the branch manager he received a salary of $350. His weekly salary of $200 was never increased during the two years he was employed as a salesman.

**4.** By letter dated October 31, 1985 Thomas Shamy, Esq., on behalf of Nicholas Mondi, notified CBI that due to its improper assignment of the Lease, the Mondis would not proceed with the sale of the property as scheduled on January 3, 1987. Complt. at ¶ 14.

The Court at this juncture grants plaintiff's request to reform the contract to correct the typographical error in the date of the closing from January 3, 1983 to January 3, 1987.

**5.** Nicholas Mondi is the sole stockholder in Brunswick Beverages, Ltd.

(1975). Reasoning that if a showing of irreparable harm is required where a plaintiff must also establish probable success on the merits, "then *a fortiori* where the plaintiff establishes something less than probable success as to the merits, need for proof of the threat of irreparable damage is even more pronounced. In sum the balancing of hardships test ... necessarily includes the showing of irreparable harm." 535 F.2d at 1359.

Thus, to obtain a preliminary injunction in this Circuit a movant must establish: (1) irreparable harm and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping in movant's favor. *See Power Test Petroleum Distributors v. Calcu Gas*, 754 F.2d 91, 95 (2d Cir.1985); *Gemini Supply Corp. v. Zeitlin*, 590 F.Supp. 153, 155–56 (E.D.N.Y.1984).

A. *Irreparable Harm*

■ This prong of the test is critical to plaintiff's application and, therefore, warrants close and careful scrutiny by the Court. A successful plaintiff must demonstrate that absent interim relief it will suffer an injury that is neither remote nor speculative, but actual and imminent. In the instant action plaintiff asserts that if a preliminary injunction does not issue preventing the defendants from using CBI's confidential information, the defendants will "enjoy an unfair advantage over other competitors, rendering the purchase of the assets of Somerset by CBI a worthless transaction and leaving a definite likelihood that CBI would lose substantial business." Pl's Mem. at 3.

■ The Court cannot agree that the scenario plaintiff describes presents a high risk of irreparable injury. The mere fact that three of CBI's former employees have formed their own company and are now operating out of Nicholas Mondi's garage, Tr. at 75, in competition with other syrup vendors including their former employer does not necessarily mean that CBI will lose substantial business. CBI is free to compete with Brunswick Beverages, Ltd., and retain or woo back any of its old customers it may have lost. Alternatively, CBI may decide to relinquish its central New Jersey market and expand its sales in areas closer to its home base.

Moreover, even if plaintiff should lose business due to defendant's entry into the market and after a full trial on the merits plaintiff is awarded a permanent injunction, this Court believes that any interim injury suffered by CBI would be compensable with money damages. Irreparable harm is established not only where the injury is actual and imminent but where no adequate legal remedy exists which would redress the harm, therefore mandating the exercise of the Court's equity powers. This sound precept that "equity should not intervene where there is an adequate remedy at law," is well known and honored in this Circuit. *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 918 (2d Cir. 1986); *see also, e.g., Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) ("irreparable injury means injury for which a monetary award cannot be adequate compensation."); *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1359 (2d Cir.1976) ("equity cannot intervene where there is an adequate remedy at law"). Loss of business, if it is not remote or speculative but actual, is a quantifiable injury. Plaintiff has been in the syrup business for many years and could undoubtedly convert a loss of 25% of its customers for a given period into a dollar figure. An award of such amount coupled with a permanent injunction enjoining defendants from poaching plaintiff's customers should provide adequate redress if plaintiff prevails at the trial on the merits.

B. *Likelihood of Success on the Merits*

Although a failure to show irreparable harm is dispositive of plaintiff's application, the Court will nevertheless apply the remaining tests to the facts at bar because it will lend further support to the Court's decision.

■ Plaintiff's attempt to restrain defendants from competing in the syrup distribution market in central New Jersey proceeds on two theories. The first is a breach of contract theory based on the clause in the contract of sale prohibiting any competing enterprise within a fifty mile radius for four years which term will not expire until December 1986. The Court finds this theory to be without merit. The contract of sale was signed by Dominick Mondi, who is now retired and residing in California and who is not a principal in Brunswick Beverages, Ltd. Nicholas Mondi witnessed his father's signature and ought not be bound when such covenants are viewed unfavorably by the New York Courts and are not liberally construed. Restrictive covenants are narrowly read because sound public policy considerations strongly militate against sanctioning the loss of a person's livelihood and because enforcement contravenes New York's policy of promoting free trade. *See McKay v. Communispond, Inc.*, 581 F.Supp. 801, 806 (S.D.N.Y.1983); *American Broadcasting Co. v. Wolf*, 52 N.Y.2d 394, 403, 438 N.Y. S.2d 482, 486, 420 N.E.2d 363, 367 (1981); *Purchasing Associates, Inc. v. Weitz*, 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 604, 196 N.E.2d 245, 247 (1963).

Plaintiff's second theory is that Nicholas, Yates and Pelleriti breached their fiduciary duty when they solicited CBI's customers. The Court's analysis of this argument will focus exclusively on whether the customer list constitutes a trade secret and not on the nature of the employment agreement between Nicholas, a salesman, Yates, a secretary, Pelleriti, a driver, and CBI because a fiduciary obligation is said to be inherent in any employer-employee relationship "where the customer list is protectible as a trade secret." *Velo-Bind, Inc. v. Scheck*, 485 F.Supp. 102, 109 (S.D.N.Y.1979); *accord Speedry Chemical Products, Inc. v. Carter's Ink Co.*, 306 F.2d 328, 332 (2d Cir.1962).

■ "A trade secret has been defined as information known only to a few and not the general public." *McKay v. Communispond, Inc.*, 581 F.Supp. 801, 807 (S.D.N.Y.1983). Trade secrets are not limited to ideas but may be any information or compilation used in a business which provides an advantage over competitors who do not know or use the data. *Restatement of Torts* § 757 Comment b (1939).

■ In determining when a customer list merits protection as a trade secret the courts have resorted to a variety of factors. These factors include: (1) the extent to which the information is known outside the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort and money expended by the company in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id.*

■ The weight given to each individual factor will, of course, vary depending on the circumstances of a particular case. However, the last factor will, in almost all instances, be the most significant of the six. As a general rule "where the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products, trade secret protection will not attach and courts will not enjoin the employee from soliciting his employer's customers." *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 392, 328 N.Y.S.2d 423, 427, 278 N.E.2d 636, 639 (1972) (and cases cited therein). Where customers are discoverable only through extraordinary efforts and the employer's clientele has been secured by many years expenditure of time and money then a court may confer trade secret status upon a customer list. *E.g., Ability Search, Inc. v. Lawson*, 556 F.Supp. 9, 15 (S.D.N.Y.1981) (generally employee not barred from competing with former employer and may solicit those customers who are openly engaged in the business or equally available to him); *AGA*

*Aktiebolag v. ABA Optical Corp.*, 441 F.Supp. 747, 754 (E.D.N.Y.1977) (unless customers are not known in the trade or an employee appropriates names by copying or studied memory, lists do not merit protection); *Town & Country House & Home Service, Inc. v. Newbery*, 3 N.Y.2d 554, 558, 170 N.Y.S.2d 328, 331 (1958) (distinction is made between former employee soliciting customers of former employer who are openly engaged in business in advertised locations and soliciting unadvertised customers known to employee only through his employment); *Ferranti Electric, Inc. v. Harwood*, 43 Misc.2d 533, 536, 251 N.Y. S.2d 612, 615 (Sup.Ct. Nassau County 1964) (customer list in no way a trade secret but merely a compilation of largest and best known domestic companies in electronics field).

In the case at bar the customers solicited by the defendants were openly engaged in selling soft drinks at advertised locations and their names and addresses were readily available to those engaged in the syrup supply trade. As one of plaintiff's officers stated at the hearing, a customer "could be a luncheonette, it could be a pizza place, it could be a bar and grill, it could be a drive in, it could be a MacDonalds, it could be a Burger King, anybody that uses fountain syrup." Tr. at 19.

A second deficiency in plaintiff's allegation is the absence of proof that defendant ever copied, intentionally memorized, or "borrowed" or stole the list. *See* Tr. at 11 ("The Court: Let me ask you something: Have you ever physically missed any customer lists [because] they were never returned by anybody? The Witness [Mr. Horne]: I don't believe so, your Honor.") Indeed, Nicholas would have little need to resort to any such tactics because he was largely responsible for the list's creation. As CBI's president affirmed, the names were "developed by Somerset after years of arduous effort." Forgione Aff. at ¶ 8. As previously recounted, Nicholas ran Somerset and "was the only salesman in the company." Tr. at 47. Indeed, soliciting customers was Nicholas' forte and was the prime reason CBI rehired him in 1984 to rebuild its sagging customer base. *See supra* p. 154. The New York Court of Appeals has recognized that "[t]here are authorities which suggest that an employee may use in competition with his former employer the names, even lists, of customers retained in his memory," citing among other sources the *Restatement (Second) of Agency* § 396, Comment b (1958). *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 392 n. 1, 328 N.Y.S.2d 423, 427 n. 1, 278 N.E.2d 636, 639 n. 1 (1972). In a diversity action such as the case at bar this Court applies the substantive law of the State of New York. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Though the statement quoted above was purely dicta, it has the ring of an endorsement and this Court concurs that it represents a sound policy.

After considering the other five factors the Court finds that none weigh so heavily in plaintiff's favor as to overcome the sixth criterion. First, a list of potential customers is available to anyone who can compile a list of commercial establishments dispensing soft drinks; second, many employees had access to the books containing the customer list, although they were returned to Mr. Horne's custody when not in use. The Court also concedes that the list was useful to the company and would aid competitors because it contained specific information for each buyer regarding the quantity ordered, the manner of billing, and the usual day of delivery. Finally, the plaintiff did expend money, but not time or effort, in acquiring the list. Plaintiff's investment, therefore, does not bolster its claim that the list constitutes a trade secret. Although $65,000 of the sale price was allocated to the list, this figure has significant tax implications and may not be considered a true valuation. Moreover, plaintiff's investment was not one of time and effort to discover a hidden market, nor did plaintiff create a market for a novel type of service, *see, e.g., Town & Country House & Home Service v. Newbery*, 3 N.Y.2d 554, 558–59, 170 N.Y.S.2d 328, 331–32, 147 N.E.2d 724, 726 (court protected customer list where

plaintiff had spent three years building a clientele of 240 customers for its "unique" housecleaning service). Plaintiff chose the short cut of purchasing a business with all of its attendant assets and good will.

Thus, this Court believes that this case parallels the facts in *Abdallah v. Crandall*, 273 A.D. 131, 76 N.Y.S.2d 403 (3rd Dep't 1948), where the State Court decided that a list of customers purchasing milk in a small upstate community was not a trade secret because every family was a potential customer. Similarly, every soft drink seller is a potential customer. Hence, plaintiff's list originally purchased from one of the defendants does not bear the qualities of a trade secret.

### C. *Sufficiently Serious Questions Going to the Merits*

Although this Court doubts the probability of plaintiff's prevailing on the merits, this litigation is still in a nascent stage. Conceivably during the discovery process additional evidence may be unearthed which would support the plaintiff's allegations that the defendants copied the list or intentionally memorized the contents. Although unsubstantiated to date, these allegations nevertheless raise "questions going to the merits so serious, substantial and difficult as to make them a fair ground for litigation and thus for more deliberate investigation." *Preferred Electric & Wire Corp. v. Katz*, 462 F.Supp. 1178, 1185–86 (E.D.N.Y.1978).

### D. *The Balance of Hardships*

If this Court were to grant plaintiff's application for a preliminary injunction and enjoin defendants from soliciting any customer whose name appears on plaintiff's customer list, it would have a marked and obvious effect on the individual defendants' ability to earn a living. *Leo Silfen, Inc.*, 29 N.Y.2d at 395, 328 N.Y.S.2d at 430, 278 N.E.2d at 641. It would also inhibit free trade and the potential for competition in the central New Jersey fountain syrup market. *Purchasing Associates, Inc. v.*

*Weitz*, 13 N.Y.2d at 272, 246 N.Y.S.2d at 604, 196 N.E.2d at 247.

Denial of the injunction would require CBI to compete with the defendants' homespun operation to retain its market share. This burden does not appear to the Court to be as great a hardship as that which would befall the defendants.

## CONCLUSION

After applying the Second Circuit's test for determining whether preliminary injunctive relief is warranted, this Court concludes that the plaintiff at bar is not entitled to preliminarily enjoin the defendants from soliciting CBI's customers.

Although there was no conclusive proof that defendants were defaming the plaintiff by telling customers that CBI was no longer in business, *see* Def's Ex. A, Aff. of Salvatore Pelleriti at ¶ 6 ("I have never told any of Consolidated's old customers that they were out of business or going out of business."), the Court would certainly enjoin the defendants against doing so in the future because if such conduct is proven by a preponderance of the evidence the defendant would be substantially liable to the plaintiff. *See* Tr. at 88.

The Court reserves decision on the question of whether defendants converted plaintiff's $CO_2$ containers. Only after hearing the trial testimony on the custom and usage in the fountain syrup industry will the Court be able to decide this claim fairly. *See* Tr. at 98.

SO ORDERED.