In re AMERICAN PREFERRED
PRESCRIPTION, INC.,
Debtor.

AMERICAN PREFERRED
PRESCRIPTION, INC.,
Plaintiff,

v.

HEALTH MANAGEMENT, INC., f/k/a
Homecare Management, Inc. and
Lisa Reagan, Defendants.

Bankruptcy No. 893–84170–93.
Adv. No. 895–8222–478.

United States Bankruptcy Court,
E.D. New York.

Sept. 19, 1995.

Schwartzfeld Ganfer & Shore by Alan C. Fried, New York City, for debtor.

Rosenman & Colin by Bruce M. Sabados, New York City, for defendants.

DOROTHY EISENBERG, Bankruptcy Judge.

American Preferred Prescription ("APP" or "Debtor") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code on July 22, 1993. APP filed an adversary proceeding and in conjunction therewith obtained a temporary restraining order restraining Lisa Reagan ("Reagan"), a former employee now employed by Health Management, Inc. ("HMI") from divulging confidential or proprietary information regarding APP, including but not limited to its client list, operations and other information regarding the management of APP. Before the Court is APP's motion for a preliminary injunction against Reagan and HMI, a competitor of APP. APP seeks to enjoin Reagan from: (I) working for HMI; and (II) disclosing trade secrets and other proprietary information to HMI.

### FINDINGS OF FACT

APP and HMI are direct mail pharmacies in the business of providing pharmaceuticals and related services to patients with chronic illnesses. A substantial portion of APP's business is servicing patients afflicted by the AIDS virus. HMI specializes in pharmaceuticals and services in connection with organ transplants and has recently expanded its services to include experimental drugs.

Reagan (f/k/a Lisa Benjamin) accepted employment with APP on or about July 1992. On her first day, Reagan completed several employment forms including a confidentiality agreement (the "Agreement") in which she agreed not to disclose any trade secrets or proprietary information. The Agreement provides that such confidential information "consists of technical information, methods, processes, formulae, compositions, systems, techniques, inventions, machines, computer programs, research projects, business information, customer lists, pricing data, sources of supply, financial data and marketing production or merchandising systems and plans and other information confidential to the company." Reagan testified that her supervisor had explained to her that the Agreement was to protect the confidentiality of their AIDS/HIV positive clientele. At no time throughout her employment at APP was Reagan informed that the Agreement extended to protection of the procedures and/or systems at APP.

Reagan was hired by APP as a customer service representative responsible for answering the phones and assisting patients with questions or problems in connection with drug shipments. Within three months, she was transferred to the membership department where her job was to solicit new patients for APP's membership program. Less than a year after commencing her employment with APP, Reagan was promoted to supervisor of the customer service and membership departments where she handled the more complicated complaints and directed and trained personnel in those departments.

In addition to the responsibilities of her position, Reagan assisted in the conversion and updating of a new computer system as well as the revision of internal forms used by her department. Reagan made basic suggestions intended to make the use of the computer screens and forms more "user" friendly. These comments included placing the

customer name at the top of the screen and revising forms to include additional lines for comments or for routing copies to other departments.

Some time after Reagan's promotion to supervisor, Linda Weinclaw ("Weinclaw"), a friend of Reagan's and an employee of APP at the time, left APP and accepted employment with HMI. The principals of APP, Eleanor and Ray Adiel, informed Reagan of the circumstances of Weinclaw's departure and asked Reagan about her intentions. Reagan told the Adiels that although Weinclaw had asked if she would be interested in a position at HMI, Reagan had expressed that she was not going to work for HMI.

Reagan never signed a non-competition agreement, although a non-compete form was distributed to APP employees requesting that they "sign and return." Reagan returned the document without signing it, and marked the form with questions and comments.

At or about the end of 1994, Reagan began looking for another job and eventually contacted Weinclaw to request that she circulate her resume at HMI. Reagan interviewed at HMI but was informed that there were no positions available.

On March 23, 1995, APP promoted Reagan to the position of Vice President of Operations and Administrative Manager. Reagan's testimony as well as that of Nino Carnavale, a consultant hired by APP to implement their new computer system, indicates that the only additional information that Reagan received as a result of this promotion were three nonnegotiable contracts with managed care entities, which contracts could have been obtained by a simple telephonic request.

The testimony of Reagan and the President of HMI support her contention that she unilaterally and voluntarily sought employment from HMI, and that HMI did not solicit or recruit Reagan to leave APP and work for HMI.

On April 3, 1995, Reagan accepted a position with HMI and resigned from APP. The testimony reveals that she left the building immediately after resigning and that Mr.

Carnavale was given authorization to telephone Reagan and try to rehire her. There is no evidence that when Reagan left APP, she took documents, lists, computer disks or other records.

Reagan is currently employed at HMI as the Special Projects Manager in charge of a program for testing an FDA investigational drug to ameliorate the wasting syndrome of AIDS ("Serostin"). In this position, Reagan supervises a staff which attempts to obtain insurance reimbursement for their patients who receive this experimental drug. In addition, she acts as a liaison between the insurance companies, HMI and the manufacturer of Serostin. She makes no business decisions for HMI.

The patients receiving Serostin are referred to HMI directly by the manufacturer and are not solicited by Reagan or HMI. The majority of the forms used by HMI to administer the program are generated by the manufacturer in accordance with FDA guidelines for investigational drugs. Forms not generated by the manufacturer were created by HMI and have been in place prior to Reagan's employment at HMI.

There are no allegations in the adversary proceeding against HMI for any wrongful action by HMI, except as may be inferred by virtue of being Reagan's employer. Nor is there any evidence that Reagan has used any confidential information, or breached any confidentiality agreement. Nor is there any evidence that HMI sought or has received any confidential information belonging to APP from Reagan in breach of the Agreement.

APP is seeking to enjoin her from acting in breach of the Agreement in advance of, and or in anticipation of such breach taking place.

## DISCUSSION

I. *RESTRAINING REAGAN FROM WORKING AT HMI*

 The Debtor asserts that Reagan should be restrained from being employed by HMI for various reasons. First, APP claims that the Debtor is barred from being employed by HMI pursuant to a covenant not to

compete. Courts generally look with disfavor on restrictive covenants not to compete. *See Reed, Roberts Assoc., Inc. v. Strauman,* 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 679, 353 N.E.2d 590, 593 (1976) (disfavor is "provoked by 'powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood' "); *McKay v. Communispond Inc.,* 581 F.Supp. 801, 806 (S.D.N.Y.1983); *Newco Waste Sys., Inc. v. Swartzenberg,* 125 A.D.2d 1004, 510 N.Y.S.2d 399, 400 (4th Dept.1986) (covenants which prevent an employee from pursuing a similar vocation after termination of his employment are disfavored by law). However, such covenants will be enforced where necessary to prevent disclosure or use of trade secrets. *See Reed, Roberts,* 386 N.Y.S.2d at 680, 353 N.E.2d 590. For such a covenant to prevail, it must be shown to be: (1) reasonable in time and area; (2) necessary to protect the employer's legitimate interests; (3) not harmful to the general public; and (4) not unreasonably burdensome to the employee. *Id.,* at 680, 353 N.E.2d 590; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 188(1)(b) (1981). However, we need not address these factors since APP has not produced an executed non-competition agreement, nor proven that Reagan entered into such an agreement, whether oral or written.

■ The evidence shows that APP distributed a non-competition agreement to its employees, including Reagan, and that such document was returned by Reagan with her questions and comments but without her signature. In fact, Reagan never signed a covenant not to compete. This is supported by the testimony of Terrence A Kaliner, the Chief Financial Officer at APP, in which he states that no one at APP is subject to a non-competition agreement although the form of such document is presently being finalized. In addition, Eleanor Adiel, the president of APP, testified that Reagan entered into an oral agreement in which she allegedly promised that she was "not going to HMI." This testimony is contradicted by that of Reagan's, in which she denies making a promise to refrain from ever working for HMI. This statement was made to the President soon after Ms. Weinclaw left APP to work for HMI when the President asked her if she too intended to leave to go to HMI. This discussion took place at a time when Reagan was not seeking other employment. In any case, such oral agreement, if there was any, is not valid since it was not supported by consideration from APP for any promises made therein. Ms. Adiel testified that at the time of this discussion APP did not increase Reagan's salary, give her a bonus or provide her with anything of value in exchange for her promise. Therefore, since evidence has not been produced to indicate that Reagan is subject to either a written or oral non-competition agreement, this court cannot grant an injunction to keep Reagan from working for a competitor. *See McKay,* 581 F.Supp. at 806 (the court refused to enforce a covenant not to compete where the employer could not produce such agreement and the employee denied executing such a document).

■ APP contends that Reagan violated her fiduciary duty as an officer of APP by accepting employment with HMI. Absent a restrictive agreement or breach of trust, the law provides that an employee may seek employment prior to resigning their position. *See Auxton Computer Enter., Inc. v. Parker,* 174 N.J.Super. 418, 416 A.2d 952, 955 (Ct. App.Div., 1980); and *Abraham Zion Corp. v. Lebow,* 593 F.Supp. 551, 557 (S.D.N.Y.1984), *aff'd,* 761 F.2d 93 (2d Cir.1985) (right to make preparations prior to termination to set up or enter into employment with a competing business). Even a high level employee is free to compete with former employers. ZAMORE, BUSINESS TORTS, § 4.04[1], volume II, at 4–16 (1995). Reagan has met the duties of her position at APP as evidenced by her many promotions and by the fact that APP sought to rehire her after she resigned. Neither her resignation, job search efforts nor subsequent employment at HMI constitute a breach of any trust where, as here, there was no obligation not to compete.

Barring a finding that Reagan breached any agreement, APP suggests that the only way to prevent the disclosure of their proprietary information is for this court to enjoin Reagan from working with any competitor in the HIV area who does not have an established customer service department.

■ In order to issue a preliminary injunction, APP must prove that (1) there is irreparable harm; and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and balance of hardships tipping decidedly towards the party requesting the preliminary relief. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

■ First, APP contends that absent injunctive relief it will suffer irreparable harm. It maintains that its resource information, social service information and information regarding the development of computer systems in connection with an HIV positive clientele constitutes confidential information which is at risk of disclosure to a competitor. Ms. Adiel testified that this information has taken a great deal of time and money to compile and although the information is available to anyone who "does their homework," it would give a competitor an unfair advantage to be handed such information without expending the time, effort and cost involved in conducting the necessary research.

Further, APP claims that monetary damages will be virtually impossible to calculate since there is no way to monitor whether the information will be conveyed and, whether, and to what extent it will be utilized by HMI. As such, they contend that enjoining Reagan from working for HMI is the only adequate remedy to assure the confidentiality of this information.

However, the evidence presented leaves doubt as to the likelihood of success on the merits, or the likelihood of irreparable harm. The Second Circuit has held that an applicant seeking a preliminary injunction must demonstrate that the injury is actual and imminent, and that mere possibility of harm is insufficient to justify such a drastic remedy. *Borey v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 934 F.2d 30, 34 (2d Cir.1991); *Medical Society of the State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir.1977) (injunctive relief is a drastic remedy which should not be routinely granted); *Consolidated Brands, Inc. v. Mondi*, 638 F.Supp. 152, 155 (E.D.N.Y.1986) (in order to

grant a preliminary injunction, it must be demonstrated that the injury is neither remote nor speculative but rather actual and imminent for which a monetary award cannot be adequate compensation). Mr. Norman, the Executive Vice President and Chief Operating Officer at HMI, testified that Reagan was not interviewed for her knowledge in the AIDS/HIV area or for her computer knowledge, but rather for her general knowledge of the mail order pharmaceutical business. He further stated that HMI is developing a market in experimental drugs and is not intending to enter the AIDS/HIV market at this time except as to the experimental Serostin program. Additionally, Mr. Norman testified that HMI is satisfied with the state of its customer service and, considering the profitability of HMI, there is presently no need to restructure it although minor changes are made when necessary. Thus, the testimony does not establish that there has been any disclosure or that such disclosure is imminent and will result in actual harm, or that money damages would be an inadequate remedy in the event confidential information would be revealed to HMI in the future.

■ Further, even assuming that there would be irreparable harm from the changes in Reagan's employment, it is unlikely that APP will prevail on the merits since it has not proven that a non-competition agreement exists. At most, the evidence indicates a verbal promise which is insufficient to establish a non-competition agreement. In addition, APP has failed to demonstrate that there are serious questions going to the merits and that the balance of hardships tips in its favor. No evidence was presented that Reagan has, or will, disclose any secrets; or, despite APP's contentions that HMI is venturing into the AIDS/HIV field, that HMI has received, or is even interested in obtaining the information APP seeks to protect. As such, APP has not proven how the balance of the hardships weighs heavily in its favor.

APP suggests that the facts of *Business Intelligence Services, Inc. v. Hudson*, 580 F.Supp. 1068 (S.D.N.Y.1984), are strikingly similar to this case, and as such, urges this

court to adopt its holding granting a preliminary injunction. In that case defendant employee executed a confidentiality agreement at the time she became employed and later executed a non-competition agreement in which she agreed not to work for a competitor for a one year period following her departure. Defendant later resigned to accept a position with a competitor but was enjoined by the court from so doing. This case differs significantly from *Business Intelligence* in that, as discussed above, APP has not proven the existence of a non-competition agreement. Even if we were to assume, as APP urges, that the oral promise not to go to HMI was valid, the agreement would be unenforceable due to the absence of scope and duration. Therefore, since APP has failed to meet its burden of proof with regard to the existence of a non-competition agreement and the necessity of a preliminary injunction, Reagan shall not be enjoined from working for HMI.

## II. *RESTRAINING REAGAN FROM DISCLOSING SPECIFIC INFORMATION*

■ There is no dispute that there is a valid and enforceable confidentiality agreement or that trade secrets are entitled to protection. *A.F.A. Tours, Inc. v. Whitchurch,* 937 F.2d 82, 89 (2d Cir.1991); *Consolidated Brands,* 638 F.Supp. at 156. However, there is confusion regarding which material/procedures are considered trade secrets. The courts have defined a trade secret as a formula, process, device or compilation of information used in one's business which confers a competitive advantage over those in similar businesses who do not know of or use it. *See Ashland Management Inc. v. Janien,* 82 N.Y.2d 395, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993); *U.S. Reinsurance Corp. v. Humphreys,* 205 A.D.2d 187, 618 N.Y.S.2d 270 (1st Dep.1994); *See also* RE-STATEMENT OF TORTS, § 757(b) (1939). The Second Circuit has expanded this definition by stating that a "trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *See Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir.1990). To determine whether information constitutes a trade secret, it is necessary to consider: (1) the extent to which the information is known outside the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort and money expended by the company in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See McKay,* 581 F.Supp. at 807; *See also Consolidated Brands,* 638 F.Supp. at 157 (stating that the last factor is generally the most significant).

■ APP contends that their patient/client list, physician referral sources, publications lists, resource information, internal forms, computer system and such other information as detailed in the Agreement constitute trade secrets and are entitled to protection from disclosure.

■ Generally, an employee is not barred from competing with a former employer and soliciting customers openly engaged in the business. *Id.* at 156. However, customer lists may qualify as trade secrets where the customers are discoverable only through extraordinary efforts and the employer's clientele has been secured through many years' expenditure of time and money. *Id.* at 156. The testimony indicates that APP has spent a great deal of time and money to provide support service information to its AIDS/HIV clientele. In order to reach the HIV community and expand its client listing, APP has sought out and advertised in publications addressing HIV concerns. Given the nature of the AIDS/HIV disease, it follows that individuals afflicted might seek confidentiality and would not be accessible through ordinary channels. Therefore, APP's client listing qualifies as a trade secret.

■ In order to better aid their clientele, APP has compiled various materials including a physician referral source, publications listing and resource information. The physician referral source contains names of physicians who treat patients with the HIV virus. Since many physicians do not advertise their specialization in this field, these names are generally not known to the public. The publications listing contains the names of various publications, including small underground periodicals dedicated to AIDS/HIV issues. APP provides its clients with resource information regarding social service and financial information that may be obtained through private and governmental sources. Although the names of doctors, publications, and assistance information may be public domain, these specialized compilations resulted from a great expenditure of time and money and can be a competitive advantage to APP. *Leo Silfen, Inc. v. Cream,* 29 N.Y.2d 387, 393, 328 N.Y.S.2d 423, 428, 278 N.E.2d 636, 640 (1972) (stating courts have not hesitated to protect files as trade secrets where they are secured by years of effort and advertising effected by the expenditure of substantial time and money); *Town & Country House & Home Service, Inc. v. Newbery,* 3 N.Y.2d 554, 557–560, 170 N.Y.S.2d 328, 331–32, 147 N.E.2d 724, 725–727 (1958). As such, they are considered trade secrets. Reagan, by signing the Agreement, has already consented to refrain from disseminating or revealing this information if she possesses such information. In the event of a future breach, Plaintiff may be entitled to damages.

■ The testimony indicates that Reagan spent a considerable amount of time revising internal forms and assisting in the implementation of APP's new computer system. APP contends that this information is confidential, and that Reagan should be enjoined from converting this information for her own use or from disclosing this information to future employers in this industry. This assertion is directly contradicted by *Reed, Roberts,* 386 N.Y.S.2d at 678–679, 353 N.E.2d 590, where the court held that although defendant was a key employee, his services in creating forms and setting up a computer system were not so unique or extraordinary as to warrant restraining his attempt to compete with his former employer. Reagan's involvement in the revision of forms and updating of the computer system was limited to basic comments. The testimony does not reveal that there was anything particularly distinguishable about Reagan's involvement in these areas or significant about the procedures themselves so as to constitute a trade secret. Furthermore, although APP contends that there is a significant effort to guard the secrecy of their information through computer passwords and execution of confidentiality agreements, we note that Mr. Carnavale, a consultant, did not sign a confidentiality agreement despite being made privy to all the procedures that APP seeks to prevent Reagan from disclosing.

■ While we recognize the need for an employer to safeguard his interests, we cannot construe those interests so broadly as to effectively bar an employee from future employment. *See Great Lakes Carbon Corp. v. Koch Industries, Inc.,* 497 F.Supp. 462, 470 (S.D.N.Y.1980) (holding that restricting of a former employee from using his accumulated experience, skill, appreciation of intangibles and judgment in his new employment would effectively bar him from all employment and are beyond legal limits and would have to be declared null and void); *See also Reed, Roberts,* 386 N.Y.S.2d at 680, 353 N.E.2d 590 ("no restrictions should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment").

■ Furthermore, although we have identified the materials that may be considered trade secrets, a preliminary injunction will not be granted unless there is a showing that defendant is using or disclosing such confidential information. *See Newco,* 510 N.Y.S.2d at 400, ("it is the utilization of confidential information constituting a breach of trust, and not the mere knowledge of a business' intricacies"); *In re Golden Distributors, Ltd.,* 128 B.R. 342, 345 (Bankr.S.D.N.Y. 1991) (motion to dismiss granted where complaint failed to allege that defendants misappropriated and used debtor's trade secrets); *RMC Lines, Ltd. v. Davidson,* No. 84 CIV. 7938–KTD, 1984 WL 2741 (S.D.N.Y. Dec. 5,

**358**

1984) (denying preliminary injunction where there was no showing that defendant possessed or subsequently used confidential information).

As discussed above, APP has not introduced any evidence indicating that confidential information has been disclosed or will be disclosed unless this court grants a preliminary injunction. In fact, Reagan's testimony states just the opposite; she understands that certain information such as client lists and physician referral sources are confidential and cannot be disclosed. Therefore, since the parties do not dispute the validity of the Confidentiality Agreement and Reagan acknowledges that client lists and physician referral sources are confidential, this court need not grant an injunction enjoining Reagan from disclosing information with regard to those materials.

### *CONCLUSION*

1. This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. This Court finds that Plaintiff has not proven that it will suffer actual and imminent irreparable harm and therefore denies Plaintiff's motion for a preliminary injunction enjoining Lisa Reagan from working for HMI.

3. For the reasons set forth herein, the Court denies a preliminary injunction enjoining Lisa Reagan from disclosing any information in connection with APP's client lists, physician referral sources, publications listings and resource information pursuant to the Agreement executed by her for the benefit of APP.

4. In the event Reagan does violate the Agreement, she may be subject to judgment for any damages resulting from such breach.

Settle an Order in accordance with this decision.